ISABELLA WARNER, Appellee, *vs.* VESPASIAN WARNER
*et al.* Appellants.

*Opinion filed June 18, 1908—Rehearing denied October 8, 1908.*

1. ANTE-NUPTIAL CONTRACTS—*an alleged ante-nuptial contract made after marriage and before act of 1874 took effect is void.* An alleged ante-nuptial contract, if in fact made after the marriage of the parties and before the Married Woman's act of 1874 was in force, is invalid, and cannot be ratified by the wife by any acts short of a complete acceptance of all the benefits accruing under the contract after the husband's death.

2. SAME—*when prima facie proof afforded by date of contract is overcome.* The presumption that an ante-nuptial contract bearing a certain date was executed on that date is overcome by proof that the marriage certificate of the parties was dated a day earlier; that the date in the contract and the signature thereto were in the same kind of ink as was used in the marriage certificate; that the recitals of the contract refer to the marriage of the parties as to take place in the future, and that the contract is signed by the wife in her maiden name.

3. SAME—*effect where provision of ante-nuptial contract is disproportionate to husband's means.* If the provision made for the wife in an ante-nuptial contract is disproportionate to the husband's means, the burden is upon those claiming under the husband to prove that the wife had full knowledge of all the facts and circumstances which materially affect the contract.

4. SAME—*what does not show that wife had knowledge of husband's means.* Proof of declarations by the intended wife's family, to the effect that she was to marry a stranger who was "a rich banker," "a large land owner" and a "very wealthy man," does not establish the fact that she knew of the nature and character of her husband's property, particularly where his home was in a distant place where she had never been before the marriage.

5. SAME—*wife's condition in life at time of marriage is not a test of adequacy of provision.* The financial and social condition of the wife and her father's family prior to her marriage is not a test for determining whether the provision made for her in an ante-nuptial contract is fair and reasonable in view of the character and value of the husband's property.

6. SAME—*provision limiting husband's legal duty to support his wife is invalid.* The law imposes upon a husband the duty of supporting his wife according to his ability and their station in life, and a provision attempting to limit the amount to be paid annually

to the wife "for her wardrobe and personal expenses, including pin-money," is void, as contrary to public policy.

7. DOWER—*when allowance of damages for refusal to assign dower is proper.* The bringing of a suit by the widow to have an ante-nuptial contract set aside and to recover dower is a sufficient demand, and under the statute she is entitled to damages for refusal to assign dower.

8. COSTS—*costs of additional abstract containing improper matter will not be taxed to appellant.* The costs of an additional abstract furnished by the appellee will not be taxed to the appellant where much of the matter contained therein is not necessary to a complete understanding of the case.

APPEAL from the Circuit Court of DeWitt county; the Hon. W. G. COCHRAN, Judge, presiding.

VESPASIAN WARNER, *pro se;* HUGH CREA, and JOHN FULLER, for appellants.

FRED BALL, INGHAM & INGHAM, HERRICK & HERRICK, and UNDERWOOD & SMYSER, (ARTHUR W. UNDERWOOD, of counsel,) for appellee.

Mr. JUSTICE VICKERS delivered the opinion of the court:

Isabella Warner, widow of John Warner, late of the city of Clinton, DeWitt county, deceased, filed her bill in the circuit court of that county for the purpose of setting aside a certain ante-nuptial agreement alleged to have been entered into between the complainant and said John Warner on the 29th day of May, 1874. Vespasian Warner, Flora Warner McDermott, Arabella Warner Bell and Minnie Warner Mettler, the only surviving children of John Warner, were made parties defendant to the bill, together with all other persons who claimed any interest, as tenants, lessees or otherwise, in the real estate of which John Warner died seized.

The grounds upon which the widow sought to have the ante-nuptial contract set aside are as follows: "First,

235—29

because her execution of and signature to the same was obtained by the fraudulent representations and willful misrepresentations made to her by the said John Warner at the time she executed the same, and which representations of the said John Warner she believed and relied upon at that time; second, because the sums provided for petitioner in the said alleged marriage settlement or agreement were grossly disproportionate to the amount of property owned by the said John Warner at the time of the execution of said alleged marriage contract or settlement; third, because the said alleged marriage contract or settlement shows that it was entered into after the marriage of petitioner to the said John Warner, while they were living together as husband and wife."

Vespasian Warner and Flora Warner McDermott filed their answer to the bill, in which they denied all of the essential averments upon which the complainant rested her right to the cancellation of the agreement and alleged that the agreement was fairly entered into on the 28th day of May, prior to the marriage of John Warner and the complainant, and that there were no fraudulent or willful representations by the said John Warner made to the complainant to induce her to execute said contract, and that the provisions therein made for the complainant, in view of the amount of property then owned by said John Warner and the complainant's station in life, were fair and reasonable. Arabella Warner Bell and Minnie Warner Mettler, who are half-sisters to Vespasian Warner and Flora Warner McDermott, being the children of said John Warner and complainant, answered the bill, confessing the truth of all the material allegations thereof and admitting that the complainant was entitled to the relief sought. Some of the other defendants answered, claiming some rights in certain portions of the real estate as tenants or lessees of John Warner, but there is no issue in relation to any of these collateral matters presented by this record.

After the issues were made up between the original complainant and Vespasian Warner and his sister, Flora Warner McDermott, the cause was referred to a master in chancery, with directions to take the testimony and report his findings. The taking of testimony by the master was commenced in April, 1906, and continued from time to time until it was concluded, about July, 1907. On the 23d day of July, 1907, the master's report, together with the objections and exceptions of both parties, was filed in the circuit court and the cause came on for a final hearing. Before the final hearing was entered upon, Vespasian Warner and Mrs. McDermott filed an amendment to their answer, in which they charged that appellee was of negro descent and with having concealed that fact from John Warner, and setting up that by reason of such concealment the provisions made in the contract were more than just and equitable. The complainant excepted to this amendment on the ground that the same was scandalous and impertinent and immaterial, and that it presented no legal defense to the bill. Complainant's exception to this amendment was overruled by the court, and this ruling is among the cross-errors assigned by the complainant. The master found that the contract was entered into on May 29, 1874, and that John Warner was the owner at that time of about 2200 acres of land in DeWitt county, Illinois, worth $55,000; other real estate, including his homestead in Clinton, Illinois, worth $26,900, and $49,200 in cash and credits, making a total of $131,000. The master found that there was no evidence of the circumstances attending the making of the agreement, no witnesses to its execution, no evidence of any representations on the part of John Warner as to his property, and no evidence that the complainant had any knowledge of the character and extent of his property, and that there were no circumstances from which such knowledge on her part ought to be presumed. The master also found that the provisions in the contract for complainant were dispro-

portionate to the amount of the property of John Warner at the time it was executed. The master recommended a decree setting aside the contract and giving the complainant homestead and dower in the real estate and damages for a failure of the defendants to assign homestead and dower. These findings were objected to by Vespasian Warner, as executor of the last will and testament of John Warner and in his own proper person, and by Flora Warner McDermott, which objections were all overruled by the master. The cause was submitted to the court in July, 1907. A decree was entered in vacation sustaining the master's findings in all respects except the finding that the contract was executed on the 29th day of May, 1874. The court found that the contract was executed on the 28th day of May, 1874. Upon the issue presented by the amendment made by leave of court at the time of the final hearing, the court found that there was no legal or competent evidence tending to sustain the charge that complainant was of negro descent. At the next regular term of the circuit court of DeWitt county, which convened in November, 1907, Vespasian Warner and his sister, Mrs. McDermott, filed their written motion to vacate the decree entered in vacation, basing the motion upon substantially the same grounds contained in their objections to the master's findings. The court, after overruling complainant's motion to strike the motion to vacate from the files, overruled the motion to vacate the decree and ordered that the decree should stand as the final decree of the court in said cause. From this decree Vespasian Warner, as executor and in his own proper person, and Mrs. McDermott, have prosecuted this appeal.

The record in this case is quite voluminous. There are 4000 pages of typewritten matter in the record and about 450 pages of printed matter in the abstracts. The issues involved made it necessary to take a great deal of testimony as to the extent and character of John Warner's property at the time the contract was entered into. A large amount

of testimony was taken in Ohio in regard to the question presented by the amendment to the answer as well as facts concerning the condition in life of appellee prior to her marriage. It will not be necessary to go into an extensive consideration of the testimony bearing upon some of these questions. The following is an outline of the principal facts disclosed by the testimony:

Appellee was brought up on a farm in Huron county, Ohio. Her father's name was Stephen Robinson. She had attended the country schools and had acquired a fair education, considering the limited advantages she enjoyed. She had never had any business experience and had never traveled outside of her native State prior to 1873. Some time in the spring or summer of that year, appellee, her twin sister, Arabella Robinson, and her mother went to visit relatives in the State of Kansas. On their return from Kansas appellee and Dr. Warner met for the first time. Dr. Warner was at that time a widower, fifty-four years of age. He resided in Clinton, DeWitt county, Illinois, where he had practiced his profession and accumulated a fortune estimated at $131,000. Dr. Warner was a shrewd, experienced business man and a physician of many years' experience. He was engaged in the banking business when he first met appellee. His first wife had been dead seven years. The conclusion is irresistible from the evidence that Dr. Warner became greatly impressed with appellee. The parties separated at Springfield, Illinois, appellee, with her mother and sister, going to her home in Ohio, while Dr. Warner went to his home in Clinton. A persistent courtship on Dr. Warner's part was carried on by correspondence. His letters introduced on the hearing before the master show conclusively that he had set out with a determination to win the affection of appellee with the intention of making her his wife. In his second letter Dr. Warner sent appellee his photograph and requested her's in exchange, which she sent him about a month later. The evidence is not clear

whether the engagement was effected by correspondence or took place on the occasion of Dr. Warner's first visit to appellee's home, which occurred in December, 1873. It appears quite probable from the expressions found in some of Dr. Warner's letters that a general engagement to marry had been agreed upon prior to his visit but that the time was not definitely fixed until the meeting in December, at appellee's home. In December it was definitely agreed that the marriage should be celebrated during the month of May, 1874. The correspondence of the parties continued regularly up to the time of the marriage, which was fixed for the 28th day of May, 1874. The evidence shows that Dr. Warner arrived at the Robinson home about nine o'clock in the forenoon of May 28, 1874. The marriage occurred at twelve o'clock on that day, in the presence of a company of friends and relatives of appellee. Dr. Warner and his wife left that same day for their future home in Clinton, Illinois. The original marriage certificate is in the record and shows that the marriage was solemnized on the 28th day of May. The original contract upon which appellants rely is also in the record. The evidence shows that it is all in the handwriting of Dr. Warner except the signature of appellee. The contract in question is in the following words and figures:

"This indenture of two parts, made this 29th day of May, A. D. 1874, by and between Isabella Robinson, of the county of Huron and State of Ohio, gentlewoman, of the first part, and John Warner, of the county of DeWitt and State of Illinois, of the second part, witnesseth:

"That whereas, marriage is intended to be had and solemnized between the parties aforesaid; and whereas, each party is desirous, before entering into said marriage, to know just what their rights of property is to be in each other's estate. It is agreed that the said party of the first part shall at all times have, hold, use and invest in her own name and for her sole use and benefit, all the property, real

and personal, which she now has or may hereafter acquire by gift, grant, devise or in any other manner, together with the earnings and increase thereof, the same to be at all times under her sole and separate control, with full right to part with the same by sale, gift, devise or in any other manner during her lifetime, and for the considerations hereinafter named said party of the first part agrees that she will, at all times after said marriage is consummated, join said party of the second part in executing any and all deeds or other instruments in writing which may be necessary to convey any and all lands or other real estate, or any interest that the said party of the second part may have herein or which he may hereafter acquire in any State, territory or country whatever; and whether said party of the first part joins in said conveyance or not, she hereby and herein, for the consideration hereinafter named, waives, relinquishes and releases all the rights of dower or other rights to all and any real estate of the said party of the second part, and agrees and binds herself not to make, set up or establish any claim of dower, homestead or any other right in or to any of the real estate now owned by the party of the second part or which he may hereafter acquire during the term of his life or after his death, unless the same shall be devised or bequeathed to her by the said party of the second part by will or other writing properly signed. And the said party of the second part, in consideration of the above agreements and of the said marriage, agrees and binds himself to allow and pay to the said party of the first part, yearly, the sum of $500 for her wardrobe and personal expenses, including pin-money, said sum to be paid in quarterly payments or as may be required by the party of the first part, and at the death of the said party of the second part the said party of the first part, if she survives, is to have, in lieu of dower and all other statutory rights or common law rights, the sum of $10,000, the same to be paid her out of the estate of the said party of the second

part as fast as the same can be raised without great sacrifice, with six per cent interest from the date of the death of the said party of the second part, and upon the payment of the said sum of $10,000 all the estate, real and personal, of the said party of the second part is released and discharged from all further and other claims of the said party of the first part, either statutory or common law, dower, homestead or otherwise, excepting gifts or devises by will or other instrument in writing duly signed by said party of the second part. And the said party of the first part agrees, in consideration of the above, that she will not make any claim of dower, homestead in any real estate sold or conveyed by the party of the second part during his lifetime, whether she joins in the conveyance or sale or not, and that on the payment of the said sum of $10,000, and interest from and after the death of the said party of the second part, she will execute any and all releases and acquittances in writing that may be necessary to release her dower, homestead or other statutory rights to all the real and personal estate of the said party of the second part, unless the same is devised to her by will or other instrument in writing duly signed by the said party of the second part. And this is to be a bar and estoppel in all courts of law or equity to any claim of the party of the first part to the property of the party of the second part on the payment of the said sum of $10,000, made at any time during coverture or after the death of said party of the second part, and it is agreed that this contract is to be interpreted and construed according to the laws of the State of Illinois and where the property is situated, and the object and interests of the parties hereto to be honestly carried out.

"In testimony whereof we have hereunto set our hands and seals on the day and year first above mentioned.

ISABELLA ROBINSON, [Seal.]<br>JOHN WARNER.        [Seal.]"

The parties lived happily together as husband and wife until separated by the death of Dr. Warner, December 21, 1905. Two daughters were born to them, both of whom are still living. Appellee, although only an inexperienced country girl when married, rose with the increasing responsibilities of her new station and successfully managed a home supplied with the comforts and luxuries that the constantly increasing wealth of her husband enabled him to procure. Dr. Warner died testate, leaving appellee, his widow, and his four children already named, as his only heirs. At the time of his death his estate was worth approximately $2,000,000. By his will he devised to appellee the homestead in Clinton, eighty acres of land in DeWitt county, Illinois, and all the interest that the testator owned in the home farm of the appellee's father in Huron county, Ohio. The aggregate value of the property devised to appellee is $50,000. This property was devised to appellee upon the express condition that she should ratify the antenuptial contract after the death of the testator. All of the residue of the estate the testator devised equally in fee to his four children, each taking a share *per stirpes*. Appellee filed a renunciation of the provisions made for her by the will and elected to take in lieu thereof the property allowed her as widow under the statute.

The controlling question in this case is the validity of the ante-nuptial contract. All other questions are subsidiary to this one. If the contract is sustained it settles the rights of the parties, and if it is annulled those rights are settled by the statute.

*First*—The question as to the date when the contract was, in fact, executed is important. This question is the subject of controversy under the evidence and has received extended treatment by counsel in their briefs. If the contract was executed after the marriage it is wholly void for want of consideration, and because, under the law of Illinois as it existed on May 29, 1874, a married woman did

not have the legal capacity to enter into such a contract. (*Thompson* v. *Minnich, 227* Ill. 430.)   If the contract was void because it was entered into before the enabling act of 1874 went into effect, appellee could not ratify it, after her disability was removed, by any acts short of a complete acceptance of all the benefits accruing under such contract after her husband's death.   (Page on Contracts, sec. 321; *Thompson* v. *Minnich, supra.*)   The cases of *Thomas* v. *Mueller,* 106 Ill. 36, and *Weaver* v. *Weaver,* 109 id. 225, which are relied on by appellants as establishing a contrary rule, do not go to the extent claimed for them.   In the *Mueller case* the husband, with another person, executed his promissory note to his wife for $15,000 for money loaned by her to him prior to July 1, 1874.   The husband paid interest from year to year until 1876.   In 1877 he executed a power of attorney to confess judgment on the note. Without deciding whether the husband could have avoided the note at any time because of the disability imposed on the wife, this court held that the acts of paying interest and executing the power of attorney were equivalent to the execution of a new note, and affirmed a decree dismissing the husband's bill in equity, filed to obtain relief against a judgment confessed upon the note by virtue of the power of attorney.   The case of *Weaver* v. *Weaver* is not in point. The validity of an ante-nuptial contract was there involved. The contract was made in 1877,—three years after the disabilities of married women had been removed by statute. The contract was found to be fair and reasonable under the circumstances of the parties.   It provided that the wife was to accept $12,000 after her husband's death, "to be in lieu of all her claims, whether as widow, heir or otherwise, of whatsoever nature or kind, and in lieu of dower or widow's portion."   The widow accepted the $12,000 in satisfaction of the ante-nuptial contract.   She then filed a petition seeking to have her statutory award set out to her.   It was held by this court that her claim to an award was among

the rights she surrendered by her ante-nuptial contract, and that she could not accept all the benefits of the contract and at the same time reclaim statutory rights which she had surrendered as a consideration upon which the ante-nuptial agreement rested. We find nothing in either of these cases, or in any others to which our attention has been called, contrary to the general rule laid down by this court, that a contract entered into by a married woman which was void at the time of its execution for want of capacity in her to make it, cannot be ratified by her after such disability is removed. But even if the law were otherwise, the rule would not be applicable to the facts in this case, since there is no evidence whatever tending to show that appellee ratified this contract after the death of her husband. If, after Dr. Warner's death, appellee had accepted the $10,000 and executed a release to the executor with full knowledge of all her rights, and the contract was otherwise free from legal objections, the case would be within the rule laid down in the *Weaver case.*

There is another phase of the doctrine of ratification insisted upon by the appellants, but it does not relate to the date of the contract. That question will be considered in a subsequent part of this opinion.

The question whether the contract was entered into on May 28 or May 29, 1874, remains to be considered as one of fact under the evidence. The master found the date of execution to be May 29. The chancellor who tried the cause sustained an exception to this finding and found the date of execution to be May 28, 1874. The evidence in support of the 29th of May as the true date of the execution is the fact that the instrument recites on its face that it was made and entered into on the 29th day of May, 1874. This is the only date which appears upon the face of the instrument. In addition to this fact the circumstance that no one who was present at the marriage testifies to any fact in connection with the execution of any papers at the Rob-

inson home on the day of the marriage is commented upon as tending to show that no such transaction occurred. On the other hand, appellants contend that the instrument was executed on May 28 and that the date "29" is a mistake, or, at all events, that the contract was executed before the marriage occurred, and that it is as probable that the marriage certificate which recites that the marriage was celebrated on the 28th of May is a mistake as that the date "29th of May" is wrong in the contract. We cannot accept the theory that there was a mistake in the date of the marriage certificate. It is hardly conceivable that the date of an event of such great moment to the parties would be misstated by the official who made the certificate, or that if such mistake had occurred that the parties would have accepted and retained such erroneous certificate without noticing it and making an effort to have it corrected. It is impossible to reach any conclusion on this point that is satisfactory. The best that can be done is to weigh the evidence and accept the conclusion which results from a balancing of probabilities. Whatever view is taken must be accepted with a consciousness that there are many chances against its being correct.

The body of the contract is written in blue ink. The figures "29" and the word "May" were evidently inserted in the blank spaces left for the date at a time subsequent to the writing of the body of the agreement. These two words, together with the attesting clause and the signatures of the parties, are written in purple ink. Upon comparing the color of the ink used by the justice of the peace in filling out the marriage certificate with that used by the parties in signing the agreement it appears to be the same color. If it were shown with certainty that the marriage certificate was made by the justice of the peace on May 28 we would regard this circumstance as having very considerable weight. The date of the marriage certificate is not proved by any evidence other than the fact that it is dated on the

28th.   This date is not impeached by any evidence found in the record.   In view of the importance of the event and the interest that the parties concerned must have felt in the celebration of their marriage, we think the probability that they made a mistake as to the day of the month on which the event occurred is exceedingly weak, and this probability is further weakened by the official certificate of the justice of the peace, who certifies that he celebrated the marriage on the 28th.   The recital in the marriage certificate we think may safely be assumed to be the true date on which the marriage was celebrated.   The natural and reasonable thing for the magistrate to do after the marriage was celebrated would be to make out the certificate and deliver it to the parties.   The probability that this course was pursued is strengthened by the fact that Dr. Warner and his wife left for their Illinois home on the same day that they were married.   They would naturally want their marriage certificate before leaving Ohio.   These circumstances lead us to the conclusion that the marriage certificate was most probably written up at the Robinson home on the 28th day of May. If this conclusion be accepted as true, the fact that there was purple ink at the Robinson home on that day is established.   The fact that the marriage contract was signed by the parties with ink in all respects similar to that used on the marriage certificate, while not a conclusive circumstance that both instruments were executed at the same place, is at least a circumstance consistent with the fact that both instruments were executed at the same place.   In addition to this circumstance the contract itself affords some evidence that it was executed before the marriage.   Its recitals show that it was made in contemplation of a marriage to be thereafter celebrated, and it is signed by appellee in her maiden name, "Isabella Robinson."   The evidence shows that Dr. Warner, in addition to the business already referred to in which he had been engaged, had served a term as circuit clerk of DeWitt county and had been colonel of

the 41st Illinois Infantry in the war of the rebellion. In view of the intelligence and official and business experience of Dr. Warner we think it is fair to assume that he knew that it was necessary to the validity of such a contract that it should be executed before the marriage was celebrated. Under all the circumstances, our conclusion is that the better reason is in favor of the theory that the contract was executed on May 28, before the marriage occurred.

Appellee insists that there is a presumption of law that the contract was executed on the day it was dated. This is true in a qualified sense; but this means no more than that the contract purporting to have been made on a given date affords *prima facie* evidence that it was executed on that date, and casts the burden on the party attacking the date of bringing forward the proof, in the first instance, to show a different date. The date in the contract proves itself unless other evidence is introduced showing the date to be a mistake. If such other evidence is found in the record the inference is overcome and nothing remains of the presumption. We are inclined to agree with the trial court that the evidence here is sufficient to show that the date written in the contract was a mistake.

*Second*—Since this contract cannot be set aside on the ground that it was executed after the marriage, the next question to be determined is whether the contract is void because the provisions made therein for appellee were disproportionate to the amount of property owned at the time by Dr. Warner. The law in this State is well settled that where the provision for a wife made by an ante-nuptial contract is disproportionate to the means of the intended husband, it casts the burden upon those claiming under the husband to prove that the wife had full knowledge of all the facts and circumstances that materially affect the contract. (*Taylor* v. *Taylor*, 144 Ill. 436; *Achilles* v. *Achilles*, 151 id. 136; *Hessick* v. *Hessick*, 169 id. 486; *Murdock* v. *Murdock*, 219 id. 123.) It will require but a glance at the

facts to show that the contract in question did not make a provision for appellee in a fair proportion to the amount of property owned by Dr. Warner at the date of the contract. The master has found, and that finding has been approved by the court, that Dr. Warner was worth $131,000 at the date of his marriage, of which $49,200 was personal property. Had Dr. Warner died after the marriage and before any change took place in the amount of his property, appellee would have received, under the law, one-third of his personal property, or $16,400. Dr. Warner owned at that time 2200 acres of farm lands, found by the master to be worth $55,000. Appellee would have been entitled to a dower interest in this real estate or the income from one-third of it during her natural life, which, figured at six per cent, would produce an annual income of over $1000. He also owned other real estate worth $26,900, which included his homestead and other city property. It is fair to assume that appellee would have had a substantial income from her dower interest in this real estate. But it is not necessary to go further into these figures. Appellee's interest under the statute, had she become a widow soon after her marriage, would have been far in excess of the $10,000 which she would have received under the contract at that time. The disproportion between the provisions of the contract and what appellee would have received under the statute is so apparent that we do not deem it necessary to pursue this discussion further.

*Third*—Since it appears that the provisions made for appellee by the contract are grossly disproportionate to the amount of Dr. Warner's property at the time, the next inquiry to be considered is, have appellants, in discharge of the burden cast upon them by the law, shown, by a preponderance of the evidence, that appellee had full knowledge of the nature, character and value of Dr. Warner's property at the time she executed the agreement? The line of testimony introduced by appellants upon this issue con-

sists of the statements of a number of witnesses who resided in Huron county, Ohio, in 1874, and prior thereto, to the effect that after appellee's return from Kansas there was a general report in the neighborhood that Isabella Robinson had met a wealthy banker on her western trip and that she was to be married to him. Some of the witnesses state that this information was given them by appellee, while others say it was given out by her sister and her mother, while some others could not testify to anything beyond the fact that it was generally understood that Isabella Robinson was going to marry a wealthy banker, without tracing the source of the rumor to any particular member of the Robinson family. The appellants contend that the existence of the rumor that Dr. Warner was "rich," "very wealthy," "a rich banker" and "a large land owner," in the Robinson neighborhood, cannot be accounted for in any other way than by supposing that information to have been communicated to appellee by Dr. Warner himself or that appellee obtained it by investigation made by her among the friends and acquaintances of Dr. Warner in Clinton. We think it would be an easy matter to over-estimate the value of testimony of this character given upon the recollection of witnesses thirty-three years after the conversations to which they testify are said to have occurred. We have no doubt that the fact that the daughter of an obscure farmer who resided in the rural district of Ohio was engaged to be married to a wealthy banker and a large land owner would naturally be the subject of much discussion among the people of that community, nor is it unreasonable that the amount of the reputed wealth would grow very perceptibly as the story made its way from one to another throughout that neighborhood. It is a matter within the common experience of most persons that rumors and common neighborhood gossip connected with a subject such as appears to have engaged the attention of the neighborhood in which the appellee resided will often obtain currency from a very

trifling and insignificant circumstance, and that once under way the story will take on so many different shapes and colorings that the originator of the rumor would not be able to recognize it if he should hear it after it has been repeated a dozen or more times. In this connection it is to be borne in mind that the courtship of Dr. Warner continued without intermission until his marriage, in 1874. It is not to be presumed that the people residing in that neighborhood did not discuss the fact of the marriage of appellee with Dr. Warner after it occurred, and doubtless members of the Robinson family felt more at liberty to discuss the subject of Dr. Warner's wealth after the marriage than before it occurred, even if it be conceded that their information on this subject was no better after the marriage than before. The great difficulty that witnesses would have in separating, in their recollection, matters which came to their knowledge before the marriage from those which they learned afterwards, detracts very much from the weight to be given to this character of testimony. In attempting to recall conversations which occurred so long ago, witnesses whose candor and integrity may be unassailable might easily and unconsciously be mistaken as to the time when they first heard the rumor of Dr. Warner's great wealth.

But even if it is admitted that appellee had been told by Dr. Warner that he was a "banker" and "large land owner" and "wealthy," prior to the time when the contract in question was executed, yet proof of such general facts does not discharge the burden which the law casts upon appellants to show that appellee had such knowledge of the nature, character and value of Dr. Warner's property as the law requires. As said by this court in *Hessick* v. *Hessick, supra:* "The circumstance of his reputed wealth is entitled to but little weight as tending to prove that she knew of the nature and value of his property." The terms "wealthy" and "very rich" are too indefinite and general to charge anyone with the knowledge of the kind and amount of

235—30

property possessed. In view of the confidential relation existing between Dr. Warner and appellee at the time this contract was entered into, it was his duty to make a full disclosure to appellee of all the material facts relating to the amount, character and value of his property which were necessary to enable the appellee to intelligently determine whether she desired to enter into such contract, and the burden of proving that appellee had such information the law casts upon the appellants. Such proof is not in this record. It may be true, as suggested by the appellants, that it is not within their power to make such proof at this time. This circumstance cannot change the rules of law. Whether appellants' inability to produce this testimony results from the want of witnesses, or means of evidence, or because the facts do not exist, we are unable to say. Whatever embarrassments may confront appellants at this remote period, there was nothing at the time to prevent Dr. Warner from preserving evidence that he had complied with the rules of law, if he did comply and desired to so preserve the evidence. The evidence is not here and it will serve no useful purpose to speculate upon the cause of its absence. The effect is the same whatever the cause. It is said in some of the cases that if circumstances exist from which a knowledge of the character and value of the husband's property ought to be inferred the ante-nuptial contract of a woman will be upheld, even in the absence of proof of actual knowledge. This rule has been recognized by this court in *Colbert* v. *Rings,* 231 Ill. 411, and in other earlier cases. Appellee had never been to DeWitt county prior to her marriage, and so far as the evidence shows she knew no one there except Dr. Warner. There are no circumstances in this case from which the knowledge on appellee's part of Dr. Warner's property ought to be imputed to her.

*Fourth*—It is next contended by appellants that in view of the condition in life of appellee at the time of her marriage with Dr. Warner the provisions made for her in this

contract are, under all of the circumstances, fair and rea-
sonable. It is under this contention that appellants insist
that the amendment to their answer charging that appellee
was of negro descent is pertinent. All, the evidence bear-
ing upon this question was taken, over appellee's objection,
before the amendment to the answer was made. After giv-
ing this question our most serious consideration we are
wholly unable to perceive any legal justification for its pres-
ence in this case. In our opinion the amendment to the
answer presented an irrelevant and immaterial issue and
should not for that reason have been allowed. We do not
deem it necessary to go into a discussion of the evidence
bearing upon this question. It consists almost entirely of
general repute in the neighborhood that Joseph Robinson,
the grandfather of appellee, had a trace of negro blood in
his veins; that he was a dark-skinned man, and that he
was known as "Black Robinson." His children grew up
in Ohio, and, so far as the evidence shows, associated on
equal terms with the other people of that community. They
married white people and reared families, who, in turn,
were recognized as the social equals of the other people.
Appellee's mother, it is admitted, was a white woman, and
the brothers and sisters of appellee married white persons
who were acquainted with their family history. It is mani-
fest from the entire record that this question had no bearing
upon the appellee's social standing or matrimonial prospects,
and for this reason its consideration is entirely foreign to
the issues involved here.

Aside from this question, appellants insist that in view
of appellee's condition in life at the time of her marriage
to Dr. Warner the provision made in the contract was fair
and reasonable. On this question appellants point out the
fact that appellee was born and reared in a log house; that
there were no carpets on the floors, no pictures on the walls,
no ornamental shrubbery in the yard and no fences around
the house. We are not aware of any rule of law which

measures the legal rights of a married woman in her husband's estate by the amount of property that her father owned or the character of material which entered into the construction of the house in which she was born. It may be said to the credit of Dr. Warner that when he was pressing his suit for appellee's hand he was not an adventurer on a fortune-hunting expedition. It was not houses and lands that he expected, but a true, womanly woman who was qualified to take charge of his home and make him a good, faithful wife, and the history of his more than thirty years of married life with appellee shows that she filled his expectations in every respect. The justice and humanity of our laws forbid that it shall be said to her after her lifetime of devotion to her husband: "Because you were a poor farmer's daughter $10,000 is enough for you; take that and get out."

*Fifth*—It is finally contended by appellants that inasmuch as appellee received $500 per year during her married life for her separate use she must be held to have ratified the contract, and that she is now estopped from asserting its invalidity. This contention cannot be sustained, for the reason that the evidence does not show that any part of the money received by appellee from her husband was received as a payment under this contract. The evidence shows that Dr. Warner trusted the household affairs and expenses entirely to appellee. He gave her unrestricted authority to draw checks on his bank account. She did so, and appellants have introduced checks drawn by her upon her husband's bank account aggregating many thousands of dollars, but it is shown, as above suggested, that the greater portion of this money was applied on household and family expenses, for which Dr. Warner was liable. Improvements upon the home were made as needed and paid for by appellee by checks upon her husband's account. The evidence shows, also, that the appellee drew checks for money for her own private use as occasion required, but in

no single instance does it appear that these sums were given her by reason of the obligation contained in the ante-nuptial contract. It was the duty of Dr. Warner to furnish appellee with a support suitable to their condition in life, and the evidence shows that he discharged this duty without reference to the contract, and that neither he nor appellee regarded the contract as in any way increasing or limiting his duty in this regard.

There is another view, which is not presented in the argument, to which we briefly refer. In so far as Dr. Warner undertook to bind himself to allow and pay to appellee the sum of $500 "for her wardrobe and personal expenses, including pin-money," to be paid quarter-annually during the married life of the parties, he took upon himself no obligation that the law would enforce. This part of the contract is clearly void, as being contrary to sound principles of public policy. The law casts on the husband the duty to support his wife according to his ability and station in life, and "her wardrobe and personal expenses" are a part of the support which the law requires the husband to furnish. Any contract intended to modify the legal duty of the husband towards his wife while that relation is subsisting is contrary to public policy and void. (Page on Contracts, sec. 426, and cases cited in note.) If, after the marriage of appellee and Dr. Warner, he had met financial reverses and his property had been so reduced that $500 would have been an exorbitant and unreasonable provision for appellee in view of his reduced financial condition, clearly she would have had no standing in law to have insisted on the payment of $500 to her for her wardrobe, expenses and pin-money. On the other hand, the evidence shows that after the marriage of the parties Dr. Warner's wealth increased very rapidly. The advance in the values of his real estate made a very substantial addition to his fortune. Something like $50,000 was added to his wealth every year during his married life. Under these circumstances the contract lim-

iting appellee's allowance to $500 per annum would be unreasonably small. The law has wisely fixed the limit of the support to be supplied to the wife at what is reasonable in view of the wealth of the husband and the station of the parties in life, and the parties have no legal right, by contract, to interfere with this flexible rule of law, which, by adjusting itself to the circumstances of each particular case, subserves the best interests both of the parties and the public. The evidence here shows that Dr. Warner and his wife entirely disregarded the $500 per year clause in this contract. The husband provided for his wife throughout their married life in a manner satisfactory to her and in keeping with the wealth and high social position which the parties occupied. There is no proof that Dr. Warner sought to limit his wife to $500 per year or that appellee insisted upon the payment of that sum for her support.

In view of the law which imposes upon the husband the legal duty to furnish his wife with a support according to his ability and their station in life, and the further fact that the parties to this contract appear to have wholly disregarded the annual payment clause in the agreement during their married life, the contract in question should be read and construed simply as a contract to pay her $10,000 out of the estate of her husband after his death. There are no elements of an estoppel or acts of ratification that in any way affect the right of appellee to have this contract set aside and annulled.

*Sixth*—Appellants insist that the court below erred in allowing damages to appellee for a failure to assign her dower. Section 41 of chapter 41 of Starr & Curtis' Revised Statutes of Illinois provides, that whenever, in any action brought for that purpose, a surviving husband or widow recovers dower in any lands, he or she should be entitled to recover reasonable damages from the time of his or her demand and a refusal to assign reasonable dower,

which may be assessed by the court. The bringing of this suit by appellee was a sufficient demand, and under the statute appellee is entitled to her reasonable damages for the refusal of the appellants to assign her dower. (*Bonner* v. *Peterson,* 44 Ill. 253.) There is no error in the decree in this regard.

*Seventh*—Appellee has filed a supplemental abstract of the record in this case of 99 pages. She has made a motion, which was taken with the case, that the costs of the supplemental abstract be charged to appellants. The principal matter which seems to have influenced appellee in furnishing this supplemental abstract is, that in the original abstract appellants had not copied the letters of Dr. Warner to appellee in full but had only given an abstract of such letters. These letters fill 56 pages of printed matter in the supplemental abstract. We do not think it was necessary to set out all this voluminous correspondence in full. Neither do we see any necessity for setting out the will of Dr. Warner in full, as is done in the supplemental abstract. No question as to the construction of this will is involved in the case and appellants' abstract furnishes all the information that is required upon that subject. The motion to tax the cost of the supplemental abstract to appellants will be denied. The costs other than appellee's supplemental abstract will be taxed against Vespasian Warner and Flora Warner McDermott, individually.

Our conclusion upon the whole case is that there is no reversible error in the record.

The decree of the circuit court is affirmed.

*Decree affirmed.*