[No. 32572. Department Two. June 17, 1954.]

DAVID O. HAMLIN, as *Administrator with the Will Annexed, Appellant*, v. ANGELO MERLINO et al., *Respondents*.[1]

[1]Reported in 272 P. (2d) 125.

*Carl Pruzan* and *Hay & Hamlin,* for appellant.

*Rummens, Griffin, Short & Cressman,* for respondents.

FINLEY, J.—This is a lawsuit by the administrator with the will annexed of the estate of Lucia Merlino, deceased, to have certain property determined to be community property and subject to probate proceedings. The surviving husband, Angelo Merlino, claims that the property in question is his separate property. He and his two sons by a former marriage are defendants. The lawsuit was dismissed by the trial court with prejudice. The administrator w. w. a. has appealed.

Angelo Merlino came to this country in the year 1888 when he was twenty years of age. In 1903, he organized the Metropolitan Grocery Company. For a number of years the corporation successfully engaged in an importing and wholesale grocery business. Angelo was the directing force in the corporate business. His two sons worked in the business from their early youth, apparently with a family understanding that they eventually would become its owners. In addition to his two sons, Angelo had three daughters by his first marriage. They own no interest in the business. Lucia Merlino, the decedent, married Angelo in 1929 after the death of his first wife. At the time of her marriage to Angelo,

Lucia had two adult daughters and a son by a previous marriage.

When the marriage to Lucia occurred in 1929, Angelo owned real property valued at approximately $72,000; all but two qualifying (directorship) shares of the Metropolitan Grocery Company (book value at that date being $72,880.52); and in addition, there were certain balances owing to Angelo on various sums of money he had previously lent.

Lucia, at the time of her marriage to Angelo, owned a dairy ranch (operated upon leased land), on which there were nineteen head of cattle. The ranch was later sold to one of her daughters for four thousand dollars. Lucia owned a home in Roslyn, Washington, a cafe in Cle Elum, Washington, and had a bank account in an undisclosed amount.

Prior to the marriage, Angelo and Lucia executed an antenuptial agreement which had been prepared by Angelo's attorney. Among other things, the agreement provided that the property owned by the parties at the time of their marriage, together with any increment thereof and any property subsequently "taken . . . in the name of" either of the parties, would be separate rather than community property. The significant paragraph of the antenuptial contract reads as follows:

"4. That it is the desire of the parties hereto, that notwithstanding the marriage relationship to be entered into, that each of the parties retain the separate ownership of their own property, and it is now agreed, that at all times hereafter, all real and personal property which the party of the first part owns at this date, together with all the increase thereof, no matter how derived, and the title to all property hereafter taken, whether real or personal, in the name of the party of the first part; and whatever property, whether real or personal, the title to which stands in the name of the party of the first part at the time of his death, shall be the sole and separate property of the party of the first part, and that he shall be free to devise the same by a last will and testament in any manner he may choose."

The agreement contained another paragraph similar to the foregoing one, except that it was applicable to Lucia's prop-

erty then owned and property subsequently taken in her name. The contract also provided that Angelo would maintain a five-thousand-dollar policy of insurance on his own life in favor of Lucia. She was to insure her own life for three thousand dollars, naming Angelo as beneficiary. After five or six years, both policies were allowed to lapse and were never reinstated. Angelo further agreed to provide in his will that, should Lucia survive him, she would have the use and occupancy of their family home during the remainder of her natural life, so long as she did not permanently remove therefrom. This provision was only partially complied with. Under Angelo's will, Lucia's right to use the family home would be cut off upon her remarriage, or if she should voluntarily absent herself from the home for a period of thirty days.

After the marriage in 1929, Angelo and his two sons continued to operate the importing and grocery business until 1945, at which time the corporation was dissolved. In 1946, Angelo sold the assets of the dissolved corporation on a conditional sale contract to his two sons for $133,344.28. This contract provides that whatever balance is due at the time of Angelo's death will be discharged.

Angelo and Lucia lived together for twenty-two years, until the latter's death in 1951. In her will, Lucia left her estate to her two daughters. Angelo was appointed to administer the estate. He filed an inventory and appraisal showing a bank account of $847 as the sole asset of Lucia's estate. Thereafter, David O. Hamlin was appointed as administrator with the will annexed of Lucia's estate. He initiated discovery proceedings in an effort to disclose assets of the estate in addition to the small bank account mentioned above. In the present lawsuit, appellant administrator asserts no claim to property owned by Angelo at the time of his marriage, but contends that the property, listed as follows, was acquired after the marriage and is community property and should be administered as part of Lucia's estate: (a) ten savings and checking accounts in Angelo Merlino's name, totaling approximately $48,000, which accounts were opened long after the marriage of Angelo and

Lucia; (b) a $5,000 U. S. Government bond, Series E, payable to bearer, purchased by Angelo in 1944; (c) three promissory notes, executed by Dominick and Pete DeSanto (balance at the date of Lucia's death totaling $19,301.11); (d) real property described as lot one, block four, Terry's Fifth Addition to Seattle, purchased from King county in 1939 for $260, with improvements placed thereon sometime after 1939.

We note that appellant also claims a community interest in $2,300, in silver dollars, which were kept in containers, apparently for several years, in Angelo's house. The only evidence in the record bearing on this $2,300 came from Angelo, who testified that the silver coins disappeared the day before Lucia's death. Appellant offered no proof that either Angelo or his sons have had possession of this asset at any time since the death of Lucia. Because of this failure of proof, we do not think that the matter of this item is before us, and we deem it unnecessary to determine its status as community or separate property.

It will be recalled that, prior to Lucia's death, the corporation had been dissolved and its assets sold to Angelo's two sons under a conditional sale contract. At the time Lucia died, there was still due on the contract approximately $89,000; also, Angelo had in his possession several uncashed checks representing payments made by the sons on the contract. Appellant asserts a community interest in the balance due on the contract, such interest allegedly representing the increased value of the grocery and importing business claimed to have accrued after the marriage as a result of the community efforts or labor of Angelo.

Angelo Merlino, as respondent, contends, as the trial court found, that all of the above-listed items of property, including the balance due on the conditional sale contract, are his separate property. In support of the judgment of the trial court, Angelo argues, (a) that the antenuptial agreement is valid and binding, and (b) that, as a result of it, all of the assets listed above are his separate property; he further contends, (c) that, solely by application of the

community property laws of Washington, the above-listed assets are his separate property.

In the ensuing discussion we shall, for the most part, refer to the questions raised by assignments of error rather than to the assignments specifically and individually. With this observation, we shall now consider whether Lucia acquired any community interest in the corporation. It will be recalled that, prior to the marriage and until the time in 1945-1946, when the corporation was dissolved and its assets sold to Angelo's two sons, substantially all of the corporate stock was owned or held by Angelo, ostensibly as his separate estate. If, solely by the operation of the community property rules of this state, the corporation at the time of its dissolution was the separate property of Angelo, no consideration of the effect of the antenuptial contract is necessary to establish Angelo's claim of separate ownership of the conditional sale contract, the balance due thereon, and the uncashed checks representing monthly payments. Accordingly, the problem of the ownership of the corporation will now be considered solely in relation to our community property law.

█ It is a well settled principle that separate property continues to be separate through all of its changes and transitions as long as it can be clearly traced and identified; furthermore, that rents, issues, and profits from separate property remain separate property. *In re Brown's Estate,* 124 Wash. 273, 214 Pac. 10; *Rogers v. Joughin,* 152 Wash. 448, 277 Pac. 988; *State ex rel. Van Moss v. Sailors,* 180 Wash. 269, 39 P. (2d) 397; *In re Binge's Estate,* 5 Wn. (2d) 446, 105 P. (2d) 689; *DuPont de Nemours & Co. v. Garrison,* 13 Wn. (2d) 170, 124 P. (2d) 939; *Burch v. Rice,* 37 Wn. (2d) 185, 222 P. (2d) 847.

█ In *In re Dewey's Estate,* 13 Wn. (2d) 220, 124 P. (2d) 805, we quoted from *Guye v. Guye,* 63 Wash. 340, 115 Pac. 731, as follows:

" 'Moreover, the right of the spouses in their separate property is as sacred as is the right in their community property, and when it is once made to appear that property was once of a separate character, it will be presumed that it main-

tains that character *until some direct and positive evidence to the contrary is made to appear.*' (Italics ours.)"

Appellant concedes that, at the time of the marriage, the corporation was Angelo's separate property; but argues, as mentioned above, that the increase in its value from the time of the marriage until the dissolution in 1945 was community property because it was attributable to the community labor or efforts of Angelo. During the pertinent years, Angelo paid himself a salary from the corporation, averaging $1,858 a year. This salary was unquestionably community property. However, the trial court found that the salary was used up in taking care of the living expenses of the Merlinos. From our review of the record, we are not inclined to disturb this finding of the trial court.

■ Where separate property, owned at the time of marriage, is combined with community labor of the husband to create profits or to increase the value of the original separate property, with both the community and the separate estates asserting ownership of such increment, the courts are confronted with directly conflicting principles, each demanding exclusive application. In analyzing the decisions dealing with this problem, the principle is stated that the solution of each case depends upon its own particular facts. *In re Hebert's Estate,* 169 Wash. 402, 14 P. (2d) 6. However, some other more helpful principles seem to emerge. For example, it is clear that, where the separate property in question is *real estate or an unincorporated business* with which personal services ostensibly belonging to the community have been combined, the rule is that all the income or increase will be considered as community property *in the absence of a contemporaneous segregation of the income between the community and the separate estates. Salisbury v. Meeker,* 152 Wash. 146, 277 Pac. 376; *In re Witte's Estate,* 21 Wn. (2d) 112, 150 P. (2d) 595.

■ On the other hand, where, as in the instant case, the husband at the time of marriage owned all or substantially all of the *stock of a corporation,* somewhat different principles are applicable. In such cases, where a salary is paid

to the husband by the corporation, it is reasoned that the community is thereby compensated for his services, and that any dividends paid or any enhanced value of the stock resulting from profits reinvested in the corporation are separate property. The case of *In re Hebert's Estate, supra,* is illustrative. In that case, the husband, at the time of his second marriage, owned all the stock in a corporation of which he was general manager. After his marriage, he was paid a salary of $250 a month by the corporation. Five years before his death, the husband sold his stock in return for other property. The surviving wife asserted a community claim to these assets, claiming that the greatest part of the value of the stock sold by the husband before his death accrued after his marriage to her and solely as the result of his personal or community efforts. In reply to the widow's argument, this court said:

"It seems to us, under the circumstances here appearing, that *the salary paid by the corporation to deceased, the salary being apparently a fair compensation for his services,* became the measure of the interest of the claim of the community against his personal earnings, and that the increased value of his stock, which was his separate property at the time of their marriage, became but the 'issues and profits' of such separate property, and hence also became his separate property." (Italics ours.)

See, also, *In re Dewey's Estate, supra.*

Appellant places his principal reliance upon the case of *In re Buchanan's Estate,* 89 Wash. 172, 154 Pac. 129. We there decided that, where husband and wife each contributed their separate funds to subscribe for the stock of a small corporation, and the corporation increased in value twentyfold in a ten-year period, largely through the personal efforts of the husband, there was such an intermingling of community earnings and separate funds as to render the entire interest in the stock community property. In several respects the facts of the *Buchanan* case may be distinguished from the facts in the case at bar. There, the original capital investment of nine hundred dollars was contributed from the separate property of both the husband and the wife. The

operation of the corporation was financed in large measure by community credit. Dividends were paid from time to time and were commingled with community funds. The husband and wife treated the corporate property during their lives as community property. Finally, the original separate investment was almost insignificant as compared to the value of the property at the time of the wife's death. These several distinctions are convincing to us that the *Buchanan* case is not controlling in connection with our present inquiry.

It is true that the salary paid to Angelo Merlino during his marriage was rather small. A persuasive argument can be made that, where a husband owning a *large corporation* pays to the community a salary which is grossly unfair, such salary should be disregarded with the result that profits accruing partly from community labors and partly from natural increase of the separate property will be held to be commingled and community property. However, we need not pass on this question here.

Whether a salary of $1,858 a year is fair must depend largely upon the earnings of the corporation during the time such a salary was paid. The evidence on this underlying question is wholly insufficient to support any conclusion as to the unfairness of the salary paid to Angelo. The value of the corporation in 1929 is in dispute. The book value then was $72,880. Angelo Merlino's attorney testified that he thought the corporation was then worth $120,000. Similarly, the value of the corporation in 1945, when it was dissolved, was not proved. The assets of the business were then sold by Angelo to his sons for $133,344.28; but, in view of the close relationship between the parties, this figure cannot be taken as conclusive of the actual value of the corporation. From the record, we have not been able to determine what the corporate earnings were from 1929 until 1945. As a result, we cannot say that the salary paid by the corporation to Angelo during these years was inadequate.

In accordance with the principles enunciated in *In re Hebert's Estate, supra,* we hold that the increase in the value of the corporation during the seventeen years of the

marriage must be considered as the rents, profits, and increase of Angelo's separate property, and, therefore, this increase is his separate property. It follows that the balance due upon the contract of sale of the assets of the dissolved corporation, as well as the uncashed checks given by Angelo's sons in payment thereon, are the separate property of Angelo. As mentioned heretofore, it is unnecessary to consider the legal significance of the antenuptial contract between Angelo and Lucia Merlino in so far as these assets are concerned.

The remaining assets to which appellant asserts community claims were held by Angelo at the time of his wife's death. They involve a discussion of essentially the same legal questions. These assets will be lumped together for consideration. First, with reference to their status under the community property laws of this state: It will be recalled that these assets included ten savings and checking accounts, nine of which were opened in the years 1937 through 1950. The evidence does not show when the one checking account was opened which contained $693.50 at the time of Lucia's death, but the evidence does reveal that more than that amount had been deposited therein within two months prior to her death. As indicated hereinbefore, Angelo's assets included a $5,000 U. S. savings bond, purchased in 1944; three promissory notes, payable to Angelo, representing loans made in 1948 and 1949; a lot in Terry's Fifth Addition to Seattle, purchased in 1939, together with improvements made thereon after 1939. All of these assets, with the exception of the bond and the silver dollars, were in Angelo's name. So far as the record indicates, there was no connection between them and the corporation. The evidence shows that Angelo was engaged in other business activities than the importing and grocery corporation. Thus, the decision we have reached with reference to the *separate status* of the corporation does not control in so far as the other property, mentioned above, is concerned. We further note that all of these items of property were acquired long after Angelo's marriage to Lucia. If any of these assets represented income from property owned by Angelo before his

marriage to Lucia, there is no credible evidence in the record to so indicate.

■ In the case of *Beakley v. Bremerton*, 5 Wn. (2d) 670, 105 P. (2d) 40, we said:

"This court has repeatedly held that property acquired by either of the spouses during coverture is *presumptively community property, and that the burden is upon the party who contends that it is separate property to prove otherwise. Abbott v. Wetherby*, 6 Wash. 507, 33 Pac. 1070, 36 Am. St. 176; *Ballard v. Slyfield*, 47 Wash. 174, 91 Pac. 642; *Plath v. Mullins*, 87 Wash. 403, 151 Pac. 811; *In re Brown's Estate*, 124 Wash. 273, 214 Pac. 10; *Jones v. Duke*, 151 Wash. 108, 275 Pac. 72." (Italics ours.)

See, also, *Stephens v. Nelson*, 37 Wn. (2d) 28, 221 P. (2d) 520.

■ Aside from the provisions of the antenuptial agreement, and thinking for the moment solely in terms of community property law, the fact that much of the property in question is in the name of Angelo Merlino is not controlling. We have held on several occasions that, where a spouse acquired money and placed it in a bank account in his or her own name, this fact does not overcome the presumption that the property was acquired as community property. *Plath v. Mullins*, 87 Wash. 403, 151 Pac. 811; *Jones v. Duke*, 151 Wash. 108, 275 Pac. 72.

■ We have studied the record and respondents' brief searching for evidence that might overcome the presumption. We have found only an assumption that this property was derived from separate income. This assumption is founded upon the further assumption that the community had no income during the marriage, except the $1,858 a year salary from the corporation. Something more is required to establish the separate character of the property concerned.

■ We stated in *Berol v. Berol*, 37 Wn. (2d) 380, 223 P. (2d) 1055:

"The burden rests upon the spouse asserting the separate character of the property acquired by purchase during the marriage status to establish his or her claim *by clear and satisfactory evidence. E. I. DuPont de Nemours & Co. v.*

*Garrison,* 13 Wn. (2d) 170, 174, 124 P. (2d) 939, and cases cited therein. *The requirement of clear and satisfactory evidence is not met by the mere self-serving declaration of the spouse claiming the property in question that he acquired it from separate funds and a showing that separate funds were available for that purpose. Separate funds used for such a purpose should be traced with some degree of particularity."* (Italics ours.)

See, also, *In re Dewey's Estate, supra.*

 Even if it should be assumed that a portion of the savings accounts and other assets were derived from separate income of Angelo, such funds are hopelessly commingled with those which we must presume are community funds, thus rendering the entire mass community property. *In re Dougherty's Estate,* 27 Wn. (2d) 11, 176 P. (2d) 335.

It remains for us to consider the antenuptial contract between Angelo and Lucia Merlino in so far as it may affect the status of the assets which are unrelated to Angelo's corporate business. The pertinent provisions of the antenuptial agreement are quoted hereinbefore.

It is respondents' position that, by virtue of the above-mentioned contractual provisions, *all property* acquired by the parties after their marriage was the separate property of one or the other of them, and, conversely, that there was no community property. A careful reading of the contract does not bear out this conclusion. It is not so broad as contended. There are three parts to the pertinent paragraph: (1) All property owned by Angelo at the time of marriage to Lucia, together with all increase thereof, no matter how derived, was to be his separate property. This provision does not apply to the property under consideration, since it was acquired after marriage and is not shown to be an increase or increment of property owned at marriage. (2) All property, the title to which was taken in Angelo's name. This is applicable to all the property under consideration *except* the U. S. bond. The bond was not in Angelo's name, but was payable to bearer. (3) All property standing in Angelo's name at the time of his death. This provision cannot aid Angelo, because he is still alive.

The gist of the contract provisions is that they do not purport or attempt to alter the status of property acquired after the marriage, except (a) that which is an increase to separate property owned before marriage, or (b) that "taken . . . in the name" of Angelo.

It may be seen that only the second of the contractual provisions above need be considered. Under it, the items of property, which otherwise would be community property, purportedly become Angelo's separate property merely by reason of the fact they are "taken . . . in the name" of Angelo. Appellant agrees this is the purport of the contract provision, but strongly contends that the agreement is invalid and is not binding upon Lucia or her estate. *Inter alia,* appellant argues that Angelo Merlino did not meet the strict requirements of good faith imposed upon an intended husband entering into such a contract with his intended wife.

Antenuptial agreements which are designed to alter or adjust the property rights of prospective spouses after marriage are not in themselves invalid in this state. *Clark v. Baker,* 76 Wash. 110, 135 Pac. 1025. Indeed such contracts are recognized in most, if not all, jurisdictions. However, our research reveals very few cases decided by this court involving antenuptial agreements, and none relating to the exact point here presented. On the question of adequacy of consideration for such a contract, it is stated in Lindey, Separation Agreements and Ante-Nuptial Contracts (Rev. ed., 1953) 794, 798, § 90:

"To render an ante-nuptial agreement valid, there must be a fair and reasonable provision therein for the wife, or—in the absence of such provision—there must be full and frank disclosure to her of the husband's worth before she signs the agreement, and she must sign freely and voluntarily, on competent independent advice, and with full knowledge of her rights. . . .

"Parties to an ante-nuptial agreement do not deal at arm's length with each other. Their relationship is one of mutual trust and confidence. They must exercise the highest degree of good faith, candor and sincerity in all matters bearing on the proposed agreement."

In a leading case on this subject, *Juhasz v. Juhasz*, 134 Ohio St. 257, 16 N. E. (2d) 328, 117 A. L. R. 993, the supreme court of Ohio said (p. 264):

"An engagement to marry creates a confidential relation between the contracting parties and an ante-nuptial contract entered into after the engagement and during its pendency must be attended by the utmost good faith."

This rule, in accord with the weight of authority, corresponds to the same kind of test for fair dealing this court has required of a husband who has contracted with his wife after marriage with respect to their property rights. Thus, in *In re Madden's Estate*, 176 Wash. 51, 53, 28 P. (2d) 280, we said:

"While the common law disabilities of married women have been removed by statute in this state, the confidential relationship existing between husband and wife is still recognized to exist. See Rem. Rev. Stat., §§ 1214, 5828. In such relationships of confidence, courts of equity examine with great care transactions between the parties and agreements affecting their property rights. *The burden, in such cases, is on him seeking to sustain the agreement to prove that it was fair and entered into with full knowledge of the facts by the one reposing confidence.* Perry on Trusts (7th ed.), § 194; 2 Pomeroy, Equity Jurisprudence (4th ed.), §§ 955, 956, 957." (Italics ours.)

The first inquiry in any case in which the validity of an antenuptial contract is attacked, must be directed to the adequacy of the consideration and its fairness. Under the terms of the contract now before us, all property the title to which was taken in either spouse's name would be his or her separate property. The full significance of this provision can be seen only when the relative positions of the parties are considered. Under our basic community property statute, RCW 26.16.030, the husband is made the manager of the community personal property. The statute provides:

"The husband shall have the *management and control* of community personal property, with a like power of disposition as he has of his separate personal property, except that

he shall not devise by will more than one-half thereof." (Italics ours.)

It is apparent that, under our law, the agreement between Angelo and Lucia Merlino, in so far as it affected property which otherwise would belong to the community, heavily favored Angelo. It was he who had the management and control of the community property. He had the opportunity and the power to take or place community property in his own name and, thus, to change its character to that of his separate property. In the absence of such a contract, he would, of course, have had no such rights. Under our decisions, many of which are reviewed in *Hanley v. Most,* 9 Wn. (2d) 429, 115 P. (2d) 933, the husband's power to dispose of community property is qualified in that his power of disposition must be exercised for the community and in the community interest. In the purview of this limiting principle, he is not permitted to give away community property. *In re McCoy's Estate,* 189 Wash. 103, 63 P. (2d) 522. We have held:

"The wife has a vested property right in the community property equal with that of her husband and in the income of the community, including salaries or wages of either husband or wife, or both." *Occidental Life Ins. Co. v. Powers,* 192 Wash. 475, 484, 74 P. (2d) 27, 114 A. L. R. 531.

There are other considerations which may bear upon the fairness of antenuptial contracts. These include the amount or respective values of the estates of the intended husband and wife, *Warner v. Warner,* 235 Ill. 448, 85 N. E. 630; the children of each by a prior marriage, *Juhasz v. Juhasz, supra*; and who prepared the agreement and the business experience of each, *Mines v. Phee,* 254 Ill. 60, 98 N. E. 260.

In the case before us, however, we think that the unlimited power, which the contract purported to give Angelo to unilaterally secure for his separate estate, property which would otherwise belong to the community, indicated unfairness and a breach of trust by reason of the existing confidential relationship of the parties to the proposed marriage, and imposed upon Angelo the burden of proving that Lucia fully understood the nature and significance of

the contract, and that she freely and voluntarily entered into it. Respondents did not present such proof. The record discloses that, although Lucia had some business experience, she could neither read nor write. Furthermore, the contract was prepared by Angelo's attorney, while Lucia apparently was provided with no independent legal or other advice.

We have become convinced that the contract cannot stand. With the exception of the assets traceable to the corporation owned by Angelo prior to his marriage to Lucia, the property, itemized and discussed above, is community property.

None of the parties will be allowed costs on this appeal.

The decree is reversed, in part, and is remanded with instructions to enter a decree in conformity with the views expressed herein.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and DONWORTH, JJ., concur.

