IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In re the Marriage of: | ) | |
| | ) | No. 31597-5-III |
| DEBRA MICHELLE ALDRIDGE | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | UNPUBLISHED OPINION |
| | ) | |
| WILLARD D. ALDRIDGE, JR., | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Will and Debra Aldridge first married in August 1986 and divorced in June 1994. In spring of 1996, Will and Debra resumed their relationship and remarried in March 2001. The couple separated again on September 2009. Individually, and together, Will and Debra purchased, improved, managed, and sold multiple properties, which complicates their second divorce. Will Aldridge asks this court to reverse and remand for a recharacterization and redistribution of property divided by the trial court. He also asks this court to reverse the trial court's two awards of attorney fees to Debra. We decline his request to reverse the property division. We affirm the trial court's award of fees for services before the superior court. We reverse the trial court's

award of fees to Debra for the appeal, but allow Debra the opportunity on appeal to request an award of reasonable attorney fees and costs.

## FACTS

By education and training, Will Aldridge is an architect and Debra Aldridge a nurse. Beginning in 1982, Will worked as an architect at the Naval Yard in picturesque Anacortes, Washington. He also engaged in the buying, improving and selling of real property.

Will and Debra Aldridge have married and divorced one another twice. Each has children from previous relationships. Will and Debra Aldridge married first in August 1986. They divorced in June 1994. The trial court then awarded Debra, as her separate property, the family home on Peters Lane in Anacortes. The trial court awarded Will, as his separate property, his federal civil service retirement pension and the Commercial Avenue building in Anacortes.

In 1995, during the couple's intermarriage years, Will Aldridge purchased a cabin on Yokeko Drive and a duplex on 8th Street in Anacortes. In spring of 1996, Will and Debra coincidentally saw one another at a Rite Aid store, after which they "just kind of resumed [their] relationship." Report of Proceedings (RP) at 22. Eventually, they cohabitated in the Peters Lane home.

In February 1999, Will purchased the commercial Deaconess Building, in Wenatchee, paying $10 and assuming a substantial Environmental Protection Agency

(EPA) lien. A dominant issue at trial was whether Debra and Will had formed an equity partnership under Washington law prior to Will's purchase of the Deaconess Building. The trial court found that the parties entered a committed relationship effective March 1, 1999, one month after the purchase. On appeal, neither party challenges this finding or its legal impact. Debra looked at the Deaconess Building before its purchase, but Will took title to the property only in his name.

On November 24, 1999, Will Aldridge divided the Deaconess Building into two condominium units. Unit one consists of leasable office space; unit two consists of apartments.

In December 1999, Will Aldridge transferred unit two of the Deaconess Building to Deaconess Apartments, a limited liability company (LLC) he formed. In turn, the LLC named Will as its manager. Will then developed the unit two apartments into low-income housing to gain tax benefits available under 26 U.S.C. § 42. Will and his attorney marketed the tax credits to investors. As is typical for section 42 housing, the development's investors owned 99.99 percent of the LLC, with Will owning the remaining 0.01 percent. The LLC compensated Will as manager and paid him a "deferred developer fee." Clerk's Papers (CP) at 288. The trial court later explained: "The value of the project to [Will] during development came, in part, through his ability to work as the 'developer' and receive a salary for that work." CP at 288.

Will and Debra Aldridge remarried on March 7, 2001.

3

Will Aldridge used earnings from unit two of the Deaconess Building to commence development of unit one as commercial office space. Will needed additional financing and, in May 2001, he borrowed $250,000 from a friend, Tryg Fortun. In July 2002, Will borrowed $320,000 from his mother, Eleanor Aldridge. The notes and deeds of trust for both of these loans collateralize unit one and bear only Will's signature.

The Deaconess Building required substantial renovation, most of which was performed by a hired contractor. Both Will and Debra Aldridge personally performed renovation tasks, with Will performing more work than Debra. Will described the Deaconess Building as a retirement plan for the couple.

In May 2002, Will and Debra Aldridge purchased, with title in both names, the Poolside Apartments, on Mission Street in Wenatchee. Remarkably at trial, neither party provided records establishing the purchase price for the property. Debra Aldridge guessed the price was $200,000 or $300,000. Will sold the 8th Street Anacortes property for a net gain of around $32,000, which he contributed toward the purchase of the Poolside Apartments. The balance of the purchase price for the Poolside Apartments came from two successive loans obtained by the parties in both of their names. The successive lenders were Tryg Fortun and Wells Fargo Bank.

The Poolside Apartments also needed substantial renovation and each spouse assisted in the renovation project. Debra Aldridge quit working as a nurse for the Navy in 2002, in order to devote time to the couple's real estate projects, especially the

4

Poolside Apartments. At trial, neither party provided an adequate accounting for how much each contributed to the apartment building. The debt on the building, at the time of trial was $525,179. Will believed the value of the Poolside Apartments to be $952,000. Debra valued the property at $850,000.

In 2003, Debra Aldridge sold the Peters Lane, Anacortes, home. Will Aldridge sold the Yokeko cabin. At trial, Will estimated that the net proceeds on Peters Lane property was $91,000 and the net proceeds for the Yokeko cabin was $78,000. The couple used proceeds from each sale to jointly purchase a residence on Dogwood Place, in Mount Vernon.

In 2004, Will and Debra Aldridge added one another as account holders to each party's separate bank accounts. Also in 2004, Will retired from the Naval Yard. He receives around $2,700 a month from his civil service retirement.

In 2006, Will Aldridge sold the Commercial Avenue, Anacortes, property and purchased rural vacant acres in the Squilchuck area of Chelan County. Will claims he netted $535,796 from the sale of the Commercial Avenue property, but no record supports his allegation. Will used $225,000 of the proceeds of the Commercial Avenue property to purchase the Squilchuck property. Will added Debra's name to the Squilchuck title in order to qualify for a 1031 like-kind exchange to avoid federal income tax. The value of the property is $185,000.

Will Aldridge testified at trial that he deposited excess funds from the sale of the

Commercial Avenue property into a joint account "at a financial accounting company at Wells Fargo Bank, and I don't remember the name of the company. It was one of these financial management companies." RP at 688.

In 2006, Will and Debra Aldridge sold the Dogwood home to purchase waterfront property on Satterlee Road, in Anacortes. In addition to using proceeds from the Dogwood home sale, the couple procured a bridge loan from Tryg Fortun and Will contributed funds from the sale of the Commercial Avenue building in Anacortes. The couple initially lived in a cabin on the lot. They demolished the cabin and built a home designed by Will. At trial, Will Aldridge offered six letters from neighbors, which described Will as working 8-12 hour days, 6-7 days a week for almost a year and a half to complete the Satterlee home. In the process of construction, the parties obtained a loan under both names that, with subsequent payments, is now $285,000 outstanding.

At trial, both Will and Debra Aldridge requested possession of a particular china cabinet and its contents. Will testified that the china cabinet "belonged to my first wife's grandmother. It has sentimental value for our family." RP at 610. Debra testified that the contents of the cabinet belonged to her. Debra assigned a value of $600 to the China cabinet and contents. Will assigned a value of $300.

In 2007, Will and Debra Aldridge purchased a time-share in San Jose del Cabo, Mexico. Both value their time-share interest at $5,000, but neither wanted the interest.

The couple separated for the second time in September 2009.

PROCEDURE

On November 4, 2009, Debra Aldridge filed a petition for marriage dissolution in Chelan County Superior Court. That same day, Debra asked the trial court to enter a temporary order allowing her to reside at, manage, and receive income from the Poolside Apartments, while permitting Will to reside in the Satterlee home and manage the Deaconess Building. Will Aldridge agreed to this temporary financial and living arrangement. At trial, Debra lived at the Poolside Apartments, while Will resided at the Satterlee home.

Also on November 4, 2009, Debra Aldridge moved the trial court to order Will to return $16,000, declaring:

> In September 2009 Willard removed $11,500 from the Poolside bank account which was an accumulation of funds from the operation of the business. I am asking that he be ordered to return the funds to me. He also removed $4,500 from my savings account which I am asking that he be ordered to return to me. He took my check book, the Poolside check book and my savings pass book all of which should be returned to me.

CP at 8-9. Will countered that:

> [Debra] fails to state that on September 15, 2009 she withdrew $21,000 out of a joint CD, and completely drained our Washington Federal Bank account. I have filed (under seal) true and correct copies of bank statements showing this amount of the withdrawals as well as the date. When I realized that she was withdrawing money from our bank accounts, I did withdraw approximately $21,000 from some of our other bank accounts. I have filed (under seal) true and correct copies of the records from the bank showing the amount and dates of the withdrawals.
> It appears as though we both withdrew the same amount of money and I propose we each keep what we have withdrawn. I did have

7

petitioner's check book but I have since returned that to her. I do not believe I have the Poolside check book or savings pass that she refers to. I will keep looking and if I come across it, I will return it immediately.

CP at 30. Will also listed community debts he had paid and asked the court to order Debra to reimburse him for half the cost of those debts.

On December 28, 2009, the trial court ordered Will Aldridge to return to Debra $14,000, recognizing that Will paid $2,000 for roof repairs at the Poolside Apartments. The court ordered that Debra "shall retain the $20,000 that she withdrew from Washington Federal Savings Bank on 9/15/09, but she shall be prohibited from spending the funds." CP at 40. The court further ordered:

> [Will] shall pay the mortgage, insurance and property taxes on the home at 13207 Satterlee Rd, Anacortes, WA. If [Will] makes unilateral decisions to do work on the Anacortes home where he is residing, he will be responsible to pay for the work done with the right to seek reimbursement for such expenditures when a final division of assets and debts is determined.
> . . . .
> Each party will account on a monthly [basis] for the receipt of income from community and separate property business interests and the payment of debts and expenses in order to determine the amount of monthly income that is generated. No later than the 10th of each month following the month in question, the parties will provide to each other a strict accounting of all income and expenses. The Court reserves the right to award the equalizing payment requested by the petitioner/wife in her motion. The Court expects the parties to use business income to pay their reasonable living expenses.

CP at 39-40.

On January 7, 2010, Will Aldridge moved the court to reconsider its order that he

8

return the $14,000. Will informed the court, for the first time, that he had already spent the money and did not have the present ability to repay that amount. On February 1, Debra Aldridge moved to enforce the court's December 28, 2009 order. Debra averred that Will had not provided timely financial reports for the Deaconess Building. Debra also requested $750 in attorney fees incurred in bringing the motion.

At a hearing, February 8, 2010, the trial court denied Will Aldridge's motion and granted Debra Aldridge's motion. The notes for that hearing provide:

> Court noted It [sic] was troubled there was no documentation as to where Husband spent the money, denied the revision request.
> . . . .
> Mr. Volyn [Will's counsel] noted Husband had sent January through November 2009 [income and expense] statements, via email to Wife, argued he was in compliance. Ms. Schmidt [Debra's counsel] requested attorney fees. Court ordered Husband to provide full Deaconess statements to Wife, may be forwarded through Mr. Volyn or Ms. Schmidt. Court indicated It expected to see, each month, a listing of what monies were taken in and what bills were paid. Court ordered Husband to provide the December Deaconess accounting statement by 2/20/2010 and January's statement was due in two days. Court noted all statements were due by the 10th of each following month. Court granted Motion to Enforce, awarded $500.00 in attorney fees against Husband for failure to comply and replenish the withdrawn funds.

CP at 62-63.

In 2010, Will Aldridge purchased a house on Gibraltar Road in Anacortes. Will rents the house.

On April 14, 2011, Debra Aldridge again moved to enforce the court's December 28, 2009 order. Debra averred that Will Aldridge had failed to provide her with monthly

9

financial statements and failed to return $12,000 of the $14,000 ordered. Debra also requested $500 in attorney fees incurred in bringing the motion. The clerk's notes from the motion hearing read:

> Court ordered [Will] to return the $12,000 owed to [Debra] immediately. If this amount is not paid within 1 week, Wednesday, April 27, then [Will] shall owe $13,000 and if $13,000 is not paid by Wednesday, May 4, [Will] shall owe [Debra] $14,000. Court ordered [Will] to report to the Chelan County Jail if not paid and remain in jail until paid. Court noted Its extreme unhappiness with [Will].
>
> . . . .
>
> Court further ordered [Will] pay an additional $500 attorney fees for the necessity of bringing these matters back before the Court that the Court had previously ruled upon.
>
> . . . .
>
> Court reiterated if monies were not paid by May 4, 2011 [Will] shall check himself into the Chelan County Jail and remain in jail until he purged the contempt.

CP at 109. Will borrowed funds from his mother to pay the ordered amount.

On November 14, 2011, Will Aldridge sought court permission to list both the Satterlee house and the Poolside Apartments for sale. On December 23, Will amended this motion to also ask the court for permission to change the beneficiary of his life insurance and pension benefits and either receive comparable payment for the monthly medical premiums, or be allowed to drop Debra from his medical insurance coverage. Will declared:

> 9. During the pendency of the Satterlee house listing and sale, I ask the court to allow me to rent out the house to help alleviate some of the financial burden of the maintenance and mortgage of this community asset.

10

10. I have been making improvements and maintaining the Satterlee house, as well as making the mortgage payment. I have also been responsible for the Deaconess Commercial expenses and upkeep. I am asking that the court split the Poolside Apartment income equally between my wife and myself. Debra does not have to make a house payment, and has only the expense and upkeep of Poolside, where I have the responsibility of maintaining two assets. It poses a serious financial hardship for me to keep them both with the small income from Deaconess Commercial.

11. I have been forced to keep Debra as my beneficiary for both my life insurance and my pension benefits. My monthly pension is reduced by approximately 15% as Debra is listed as the named pension survivor beneficiary. I would like to be able to change those, as this dissolution action should have been concluded this month at Trial, except Debra's father's health took a turn for the worse and she asked if we could reschedule, and I agreed.

CP at 118.

In opposition to the November motion, Debra Aldridge argued that Will caused his own financial hardship by investing in the Gibraltar property. The trial court denied Will's request to list the Satterlee and Poolside Apartments for sale, but granted his motion to rent the Satterlee home.

On April 6, 2012, when Debra and Will Aldridge each filed a trial memorandum, both parties' attorneys relayed to the court their respective fees. Debra's attorney, Kathleen Schmidt, declared:

Ms. Aldridge, through July 23, 2012 has incurred $29,522 in attorney fees and $8,809.90 in costs. With authorization from the Court, she used $5,000 from the $20,000 account she was to preserve in costs to Pacific Appraisals. She has paid an additional $16,603.17 in costs and fees that have been paid directly to her counsel. A balance is due to counsel for

11

fees and costs advanced of $33,331.90 less $16,603.17 paid for balance due of $16,728.73.

CP at 565. Likewise, Will Aldridge's attorney, Scott Volyn, declared that Will owed $43,326.66 in attorney fees and costs. Volyn did not indicate whether Will had paid some portion of that debt or not.

Trial occurred April 9, 10, 11 and July 2, and 3, 2012. When asked at trial about financial records Will Aldridge testified, "I'm not an accounting person. I don't keep track of detailed financial records. Once they're more than past—I think it's three years the IRS requires you to keep your records, I don't pay too much attention." RP at 528.

Will Aldridge testified at trial that he did not contribute to Social Security while working as a federal employee. Will testified that maintaining a survivor beneficiary for his federal pension reduced his pension payment by 15 percent.

During trial, the trial court questioned Will Aldridge about his fractional interest in the Deaconess's unit two apartments:

> Q Okay. Can you explain to me, because it has yet to be explained to me, the rationale of why you would go from owning $750 in a three-quarters of a million dollars to owning almost $500,000 in a three-quarters of a million dollars?
> A Explain the rationale for that?
> Q Yeah. I don't understand this business arrangement and I feel like something is being hidden or concealed.
> A I know it's confusing but nothing is being hidden or concealed. These are very—this Operating Agreement document is almost a boilerplate for these types of projects and there are many of these that are executed every year through the Washington State Housing Finance Commission. Basically, the tax credit investors get the bulk of their return

12

by claiming tax credits—10 percent of their tax credits every year over a ten-year period. That's the bulk of their return, plus they get some depreciation. And if there's a loss, they take the loss on the property also. Then they've pretty much satisfied their return. However, they're required by the IRS to stay in for the additional time period. That's just a requirement of the program. I don't really know the rationale of why these tax credit programs are set up this way. It's just—

Q Okay. And forgive the use of this word, but then this whole thing where you keep saying, I only own point one percent, is really a bit of a shell game or a sham because ultimately, you do own 65 percent of the building.

A Only if it's sold or refinanced, but if I were to do that, I would have to—whatever their share is, I would have to buy out their 35 percent share.

THE COURT: I understand that, but—okay. Mr. Volyn, we're back to you for redirect.

MR. VOLYN: I just have a question for Your Honor at this point on the record. Your Honor has just described a Section 42 partnership as a sham or a shell game, and I'm just trying to understand whether or not my client's participation in a Section 42 tax partnership is somehow being characterized by the Court as improper or illegal? The Court's calling it a sham and I'm trying to understand where that's coming from and why that terminology would be used.

THE COURT: Certainly, the Section 42 tax credit is apparently something that's approved by the federal government, but throughout this trial, it's been presented to the Court that Mr. Aldridge's interest in the Deaconess Apartments is only point one percent. And then I think a question I asked when we were last in court is, why would anybody in his position even bother to get into this sort of thing if all he's getting out of it is $750 16 or more years down the road. And, of course, I think he testified, in part, well, he got to do some—got some development fees so that was income to him, but it wasn't making sense to the Court that he would go from point one percent to 65 percent, and there was no explanation about why that would happen. And so my reference to a shell or sham is just the sense that his ultimate interest in this is really 65 percent, even though what we've been hearing is this point one percent all the way along, and that's how all of these Section 42 things are set up with the ultimate intention that in this, you know, place, the developer ultimately gets some reward at the end of the line, so—

13

No. 31597-5-III
*In re Marriage of Aldridge*

MR. VOLYN: All right, Your Honor. Thank you. I don't have any more questions for this witness.

RP at 695-97.

At the conclusion of trial, Will Aldridge admitted the Satterlee Road home is community property, but he sought an award of the home while claiming he contributed $268,000 in separate funds to the acquisition of the home. He arrived at the figure by adding $77,000 from sale of Yokeko cabin, passing through the Dogwood home sale, and the $191,000 from the 1031 exchange of the Commercial Avenue property. Both the commercial building and the cabin were his property before the committed relationship. He also requested distribution of the Satterlee home since he designed the home, built the home, and contributed uncompensated labor at the home on a nearly daily basis for two years. In the event the trial court did not award him the Satterlee home, Will Aldridge asked for an equitable lien of $260,000 against the value of the home. Will also argued that the Poolside Apartments was his separate property pointing to his separate contribution of $32,000.

At trial, Debra Aldridge requested payment of her attorney fees by Will based upon her financial need and Will's intransigence throughout the proceedings.

On October 24, 2012, the trial court issued a memorandum opinion, including exhaustive findings of fact and conclusions of law. The trial court's unchallenged findings include:

14

73. The parties each presented their purported accounting records for operation of the respective entities (the Poolside and Unit I). These records are less than models of clarity, consisting mostly of pages of handwritten columns of dollar amounts. For some of the Poolside records, petitioner [Debra Aldridge] was unsure what various figures represented. Respondent [Will Aldridge] acknowledged that certain payments ostensibly depicted in his "accounting" have not actually been made.

74. Considering the passage of time since separation and the overall financial picture presented to the court, the court will not retroactively parse the accountings provided by the parties. However, the court makes note, based on the tax returns filed by the parties, that the Poolside Apartments have generated a yearly income to petitioner of approximately $33,736 (average for 2010/2011) or a monthly income of $2,811. In addition, petitioner has received a place to live for no additional cost.

75. Respondent has not yet filed his 2011 tax return. However, based on the 2010 information, Unit 1 has provided respondent with a yearly income of approximately $31,250 or a monthly amount of $2,604.

76. Both of these income figures allow a substantial deduction for tax purposes for depreciation ($22,000 per year for the Poolside and $30,000 per year for Unit 1).

CP at 290.

Based upon appraisal testimony, the trial court valued the Poolside Apartments at $900,000. The current debt against the apartments was $525,179 for a net value of $374,821. The trial court awarded the Poolside Apartments to Debra Aldridge. The court awarded Will Aldridge the Deaconess Building.

The trial court concluded that the Squilchuck property was acquired entirely with proceeds from the sale of Will Aldridge's separate asset and should be characterized as his separate property. The trial court concluded that the home on Gibraltar Road, in Anacortes, was Will's separate property.

15

The trial court valued the Satterlee Road residence at $800,000, which took into account the need for repairs and finishing work. The court found that the Satterlee home was entirely community property, divided it 58/42 in Debra's favor, and ordered that either Will or Debra could buy out the other's interest or, in the alternative, for the house to be sold.

The trial court ruled that Will Aldridge's federal retirement pension is community property for that portion accruing beginning March 1, 1999. The community portion of the retirement benefit is approximately 22 percent, or 5 years out of 22 years total. The community portion of the monthly benefit is therefore approximately $594. The trial court awarded Debra 11 percent of the retirement monthly payment, or $297 per month.

The trial court valued Will's 0.01 percent interest in unit two of the Deaconess at $75 and awarded it to him. And the trial court assigned a value of $600 to the china cabinet and awarded it to Debra.

The trial court summarized its award quantitatively as granting Debra 44 percent and Will 56 percent of the total assets. Debra received 68 percent and Will 32 percent of the community assets. The totals did not include the value of the Gibraltar home, present value of Will's civil service retirement pension, or a division of the Satterlee residence.

The court awarded Debra $10,000 in attorney fees based on the property distribution and events in the litigation. The court dissolved Debra and Will Aldridge's second marriage to each other on December 12, 2012.

16

Almost two months passed from when the court issued its initial memorandum opinion and the decree of dissolution. In the decree, the court noted that neither Debra nor Will intended to buy the other's interest in the Satterlee home. So the court ordered:

> The wife shall be responsible for the marketing and sale of the Satterlee home. If the wife fails to sell the home within 12 months of the final decree, the husband shall take over responsibility for the marketing and sale of the Satterlee home. The home repairs necessary before listing shall be arranged, paid for and completed no later than March 15, 2013 to allow the home to be listed by April 1, 2013.

CP at 304.

On December 21, 2012, Will Aldridge moved the trial court to reconsider (1) its award of $10,000 attorney fees; (2) its characterization of the Poolside Apartments as entirely community property in light of his contribution of $32,000 of separate property; and (3) its award to Debra of the china cabinet, which he described as "an Aldridge family heirloom passed down through a number of generations." CP at 23. Will also sought permission to continue residing in the Satterlee home until August 1, 2013.

In response, Debra declared:

> Will bought [the china cabinet] for me for a birthday gift. The cabinet originally belonged to his ex-wife's mother and she no longer wanted to have it nor did either of her daughters. This china cabinet is not an Aldridge family heirloom. I recall that Will paid $75 for this china cabinet. I then took it upon myself to refinish it. At the time it was acquired some 20 years ago, he represented it was a birthday gift for me. I believe that Will is asking for it only because it matters and means something to me.

CP at 359.

17

On January 9, 2013, Debra Aldridge moved to amend, clarify, and enforce the

decree of dissolution. Debra specifically asked the court to order Will to move from the

Satterlee residence and to allow contractors access to the home for repairs. Debra

declared that Will refused to communicate with her, and that neither party intended to

purchase the other's share in the home, so it was necessary for the family home to be

sold. Debra further declared that, since she left the home in 2009, Will had allowed the

Satterlee home to fall into disrepair, citing as examples a leaking roof and resulting water

damage.

On January 23, 2013, the trial court ordered Will Aldridge to move from the

Satterlee home by February 28, 2013, and enjoined him from impeding repairs to the

home. The notes for the January 23 hearing provide:

> Regarding the Satterlee Property: Court upheld Its Decision, found
> the Respondent had been in the house for over 3 years and had made no
> effort to complete the repairs necessary for sale. Respondent shall vacate
> the premises by February 28, 2013 or a later date as approved by Petitioner.
> Petitioner may arrange repairs so long as the contractor is licensed and
> bonded. Court further Ordered the Petitioner have immediate access to the
> property for herself, the contractor and real estate agent.

CP at 370.

On February 22, 2013, Scott Volyn withdrew from representing Will Aldridge.

On March 28, 2013, the trial court ruled on Will's December 21, 2012 motion for

reconsideration. The trial court granted Will's motion in part, and denied it in part. The

18

court addressed its previous award of attorney fees, Will's $32,000 contribution toward

the Poolside Apartments, Will's request to remain at the Satterlee home until its sale, and

the china cabinet:

1. The Court has reviewed the previously entered Findings of Fact and Conclusions of Law and Decree and has determined that the Court did not enter a specific finding of fact that the former husband had been intransigent but the court noted that the former husband had delayed in providing pertinent information to the Court up to and including the time of trial. The parties had agreed to several delays of the trial and the last delay came about as the result of the illness of the former wife's father. The Court did not make a finding that the former wife was unable to pay her attorney fees. In light of the overall financial circumstances of the parties and the Court's award of the community and separate property to each party, the Court will reduce the $10,000 in fees awarded to Ms. Aldridge to the sum of $5,000 in fees. The judgment for attorney fees in the December 12, 2012 Decree Judgment #10-9-01565-5 shall be amended accordingly. The interest rate of 12% on said judgment shall be effective 12/12/12 and shall continue until such time as the judgment is satisfied by Mr. Aldridge.

2. The Court has reviewed the previously entered Findings of Fact and Conclusions of Law and the Decree and has also reviewed the court's multiple notebooks regarding the respondent's second request for reconsideration relating the Poolside Apartment down payment, value and alleged surplus cash flow. The Court considered the testimony and appraisal report from Pacific Appraisal by Bruce Bendickson who provided testimony at the time of trial. The Court continues to value the property at $900,000. The source of the $32,000 down payment that was made on the Poolside was from the separate property of the former husband. In light of the subsequent transactions relating to the Poolside Property including but not limited to taking title as husband and wife, working on the projects as husband and wife as well as borrowing money as husband and wife using the Poolside as collateral, the Court confirms that it is not going to reimburse Mr. Aldridge for the $32,000 invested or characterize the property as his separate property. The former husband's assertions that the former wife had "surplus cash flow" from the operation of the Poolside Apartments during the period of the pendency of the case is without merit and the Court will not change its determination of this issue.

19

. . . .

4. The Court has reviewed the previously entered Findings of Fact and Conclusions of Law and the Decree with respect to the respondent's fourth request with respect to the former husband remaining in residence in the Satterlee House until sold and to grant reimbursement for window installation and labor previously paid by husband. The former husband has been in residence in the home for three years while the court case has been pending and he has made no effort to complete the repairs necessary for the sale of the home. The former husband shall vacate the home on or before February 28, 2013 and the wife shall be responsible to deal with the contractor that she has hired to do the necessary repair work. The Court denies the former husband's request for reimbursement of $1,000 spent on windows and further denies the former husband's claim for reimbursement for any labor expended to repair the "tower" section of the house.

5. The Court will not change its award of the China cabinet to the former wife.

CP at 373-74.

After Will Aldridge filed a notice of appeal, Debra Aldridge filed a "Motion And Declaration Regarding Post Dissolution Issues Related To Adjustment To House Sale Price, Payment Of Attorney's Fees, And Attorney's Fees On Appeal." CP at 448. Debra moved to enforce the previous award of $5,000 in attorney fees and requested an additional award of $5,000 in temporary attorney fees so that she may defend Will's appeal. In support of the motion, Debra declared:

My financial circumstances have significantly changed since the time of the trial because of the expenditure of my cash reserves to repair and complete the Satterlee house. I continue to operate the Poolside Apartments and receive monthly income for that source. I am required to make a substantial payment on the underlying debt at the Poolside because I am unable to refinance the underlying obligation so long as I still am obligated on the debt on Satterlee and my name still appears on the underlying mortgage for the Deaconess. It has been necessary for me to

20

spend over $13,000 to fix a leak in the pool at the Poolside Apartments. As the Court may recall, the boiler at the Poolside Apartments had been limping along for some period of time and eventually needed to be replaced at a cost of $19,000. I have struggled to pay down on my sizeable attorney's fees and now I am faced with Mr. Aldridge's failure or refusal to pay my attorney the attorney's fees that had been ordered. I am also faced with trying to figure out how I am going to pay Ms. Schmidt to defend the appeal of the Decree of Dissolution.

Mr. Aldridge seems to be in a position where he is able to purchase properties that he intends to improve. He continues to have the revenue that is being generated by the commercial site at the Deaconess and he continues to have access and the ability to use funds that have been generated by the apartment at the Deaconess. He has his retirement income and has the option to buy homes and flip them. He has stated in court that he was refinancing the Deaconess but that does not appear to have happened.

CP at 452-53.

On June 11, 2013, the trial court conducted a hearing on Debra's request for fees on appeal. Will appeared at the hearing pro se and testified under oath about his financial circumstances. In its June 24, 2013 order on the motion, the court wrote:

The court has examined the financial circumstances of Debra Aldridge as set forth in her updated financial declaration and has reviewed her 2012 income tax return and has determined that Debra Aldridge has the financial need for assistance with payment of temporary attorney fees to assist her in the defense of the appeal filed by Willard Aldridge, Jr. The court was not provided with a financial declaration by Mr. Aldridge and he did not file declarations or affidavits which disclosed his income and resources. Mr. Aldridge included in his notebook some bank statements and credit card statements as well as alleged accounts payable for the Deaconess Commercial and Deaconess Apartments. He did not provide documentation under oath of his monthly income and expenses. The court has determined based on the information submitted by Mr. Aldridge and his sworn testimony taken on June 11, 2013 that Mr. Aldridge has the ability to provide the information to set forth his current income and resources and

failed to do so. Based on the information provided and the testimony of Mr. Aldridge, the court has determined that Mr. Aldridge has the financial ability to assist Debra Aldridge with her temporary attorney fees and costs on appeal and will order him to pay $5,000 towards such fees which shall be reduced to a judgment. The temporary fees shall be paid on or before July 10, 2013. If the sum is paid by the due date statutory interest shall not accrue.

CP at 505-06.

## LAW AND ANALYSIS

On appeal, Will Aldridge contends the trial court violated Washington's appearance of fairness doctrine. Will contends the trial court improperly characterized the Poolside Apartments and the Satterlee property as entirely community property, and the trial court failed to characterize the china cabinet as community or separate property. Will contends the trial court abused its discretion when it awarded Debra 11 percent of his civil service retirement benefits, when it awarded Debra the china cabinet, when it ordered the sale of the Satterlee property, and when it awarded Debra 58 percent of the proceeds of the residence. On appeal, Will contends the trial court erred when it ordered him, for the duration of his and Debra's separation, to satisfy all community debts for the Satterlee property and to return $14,500 of community funds. Finally, Will contends the trial court erred when it awarded Debra $5,000 in attorney fees for trial and $5,000 in attorney fees for the appeal. We reject all assignments of error, except the award of attorney fees on appeal.

22

WASHINGTON'S APPEARANCE OF FAIRNESS DOCTRINE

Will Aldridge contends that the trial court violated Washington's appearance of fairness doctrine. We refuse to entertain this argument since Will failed to raise any concern about any bias before the trial court.

Under RAP 2.5(a), an "appellate court may refuse to review any claim of error which was not raised in the trial court." Washington courts have applied the doctrine of waiver to bias and appearance of fairness claims. *In re Marriage of Wallace*, 111 Wn. App. 697, 705, 45 P.3d 1131 (2002); *see, e.g., State v. Bolton*, 23 Wn. App. 708, 714-15, 598 P.2d 734 (1979). One who claims a judge trying his case is biased may waive his right to complain thereof by not timely raising the objection and proceeding at trial or continuing with a pending trial as if the judge were not disqualified. *Brauhn v. Brauhn*, 10 Wn. App. 592, 597, 518 P.2d 1089 (1974). Were the rule otherwise a litigant, notwithstanding his knowledge of the disqualifying factor, could speculate on the successful outcome of the case and then, having put the court, counsel and the parties to the trouble and expense of the trial, treat any judgment entered as subject to successful attack. *Brauhn*, 10 Wn. App. at 597-98.

*In re Marriage of Wallace* is illustrative. The trial court found that the husband, during a dissolution action, repeatedly transferred assets to his father in order to defraud the court and his wife. The husband did not object to any bias until after the trial court issued its ruling awarding transferred assets to the wife and valuing the assets at zero,

23

since the husband claimed the transfers were for valuable consideration. Underlying the reviewing court's rejection of the husband's appearance of fairness argument was the husband's desire to remove the trial court for accurately scolding him for his litigation misbehavior.

Will Aldridge's accusations against the trial court mirror the arguments of the husband in *Wallace*. Our trial court accurately referred to his financial structuring as a "scam" and "shell game," after Will attempted to minimize the value of the Deaconess Building and because of the difficulty encountered in identifying and valuing marital assets. RP at 696. Will complains that the trial court assisted Debra's counsel while hindering his own, without any support for the complaint. He complains that the trial court more frequently adhered to the proposed orders submitted by Debra's attorney resulting in a strong inference of partiality. He fails to recognize that Debra's attorney may have drafted orders more reflecting the trial judge's rulings. In essence, Will Aldridge faults the trial court for efficiently and effectively performing her duties.

## PROPERTY CHARACTERIZATION

Will Aldridge contends the trial court improperly characterized the Poolside Apartments and the Satterlee Road home as entirely community property, and failed to characterize the china cabinet as separate or community property.

All property, both separate and community, comes before the dissolution court. *In re Marriage of Brewer*, 137 Wn.2d 756, 766, 976 P.2d 102 (1999). Separate property is

24

property and pecuniary rights owned by each spouse before marriage or acquired afterwards by gift, bequest, devise, descent or inheritance. RCW 26.16.010. "Property not acquired or owned, as prescribed in RCW 26.16.010 and 26.16.020, acquired after marriage . . . is community property." RCW 26.16.030. Characterization of property as community or separate is not controlling in division of property between the parties in a dissolution proceeding, but the court must have in mind the correct character and status of the property before any theory of division is ordered. *Brewer*, 137 Wn.2d at 766; *Blood v. Blood*, 69 Wn.2d 680, 682, 419 P.2d 1006 (1966).

The character of property as separate or community property is determined at the date of acquisition. *In re Estate of Borghi*, 167 Wn.2d 480, 484, 219 P.3d 932 (2009). Property acquired during marriage has the same character as the funds used to purchase it. *In re Marriage of Chumbley*, 150 Wn.2d 1, 6, 74 P.3d 129 (2003). Separate property will remain separate property through changes and transitions, if the separate property remains traceable and identifiable; however, if the property becomes so commingled that it is impossible to distinguish or apportion it, then the entire amount becomes community property. *Chumbley*, 150 Wn.2d at 5-6.

Presumptions play a significant role in determining the character of property as separate or community property. *Borghi*, 167 Wn.2d at 483. Once the separate character of property is established, a presumption arises that it remained separate property in the absence of sufficient evidence to show an intent to transmute the property from separate

25

to community property. *Borghi*, 167 Wn.2d at 484. Overcoming this presumption requires clear and convincing evidence. *Borghi*, 167 Wn.2d at 491. There are nuanced rules for real property and more liquid funds.

The *Borghi* court addressed property owned prior to marriage. To transmute real property acquired before the marriage to community property, a spouse must evidence an intent to do so in an acknowledged writing. *Borghi*, 167 Wn.2d at 490. Washington consistently refuses to recognize any presumption arising from placing legal title in both spouses' names and instead adheres to the principle that the name on a deed or title does not determine the separate or community character of the property, or even provide much evidence. *Borghi*, 167 Wn.2d at 488.

As for property acquired during a marriage, there is a presumption that the property belongs to the community. *Chumbley*, 150 Wn.2d at 5. To rebut that presumption, a party must present clear and convincing evidence that the acquisition fits within a separate property provision. *Chumbley*, 150 Wn.2d at 5. When one spouse contributes separate property toward the purchase of real property during the marriage, he or she maintains a proportionate separate interest in that real property—termed the "mortgage rule." That rule for characterizing real property provides:

> [W]here the buyer acquires legal title at the outset in exchange for a cash payment and an obligation to pay the remainder of the purchase price, the fractional share of the ownership represented by the cash payment will be owned as the cash was owned, and the character of ownership of the balance will be determined by the character of the credit pledged to secure

26

the funds to pay the seller or to secure payment to the seller. It does not matter that funds of a different character are subsequently used to pay the obligation; the character of the asset is determined by the character of the cash and of the obligation at the time legal title (and ownership) is obtained.

*Chumbley*, 150 Wn.2d at 7-8 (quoting Harry M. Cross, *The Community Property Law in Washington* (Revised 1985), 61 WASH. L. REV. 13, 40 (1986)).

This court addressed the rule for liquid funds in *In re Marriage of Skarbek*:

Separate property brought to this state by a married man and intermingled with funds accumulated here, with no effort to keep them separate, becomes community property. Commingled funds are thus presumed to be community property. And the burden is on the spouse claiming separate funds to clearly and convincingly trace them to a separate source.

However, only when money in a joint account is hopelessly commingled and cannot be separated is it rendered entirely community property. If the sources of the deposits can be traced and identified, the separate identity of the funds is preserved.

100 Wn. App. 444, 448, 997 P.2d 447 (2000) (internal citations omitted).

A trial court's characterization of property as community or separate is reviewed de novo. *Chumbley*, 150 Wn.2d at 5.

*The Poolside Apartments*

Will Aldridge contends that the trial court mischaracterized the Poolside Apartments as entirely community property, ignoring his $32,000 separate property contribution toward the purchase price. We reject this assignment of error for three reasons. First, Will failed to preserve this argument for appeal. Second, insufficient facts appear in the appellate record to address any error. Third, any error was harmless.

27

Will Aldridge did not argue below that his $32,000 contribution of separate property provided him a fractional separate property interest in the Poolside Apartments. Under RAP 2.5(a), an "appellate court may refuse to review any claim of error which was not raised in the trial court." Instead, Will argued that his $32,000 contribution rendered the Poolside Apartments entirely his separate property. The trial court correctly rejected that argument noting that community debt funded the vast majority of the purchase price and subsequent renovations.

One consequence of Will Aldridge not arguing for a fractional interest below is that the record now lacks the facts needed for the mortgage rule to operate. The mortgage rule affords a spouse a proportional separate property interest in a mathematical fashion. Courts must divide the separate property contribution—$32,000 in this case— by the total purchase price. Here, the total purchase price remains an unknown quantity. Debra testified that they might have paid $200,000 to $300,000 to purchase the Poolside Apartments out of foreclosure. Beside the impreciseness of this estimate, a court could find the renovation costs constitute part of the purchase price. *See, e.g.*, 26 U.S.C. § 1016 ("Adjustment to basis" for purposes of federal income tax). Determining the Poolside Apartment's purchase price is riddled with issues of fact that Will Aldridge could have resolved or litigated at trial, but did not.

Last, Will Aldridge asserts that, if the trial court properly characterized the Poolside Apartments, the trial court likely would have changed the distribution of

28

property in his favor. This assertion belies the trial court's written findings on reconsideration acknowledging that "[t]he source of the $32,000 down payment . . . was from the separate property of [Will]." CP at 373. Thus, the trial court had in mind the correct character and status of the property when rendering its ruling. *See Blood*, 69 Wn.2d at 682.

The trial court correctly characterized the Poolside Apartment according to the evidence presented. Will Aldridge presents no error for this court to correct.

*The Satterlee Residence*

Will Aldridge contends that the trial court mischaracterized the Satterlee Road residence as entirely community property, despite the court's finding that he contributed funds to purchase the Satterlee Road home from his sale of the commercial building in Anacortes. We reject this assignment of error also. Will likely invited any error, failed to preserve this argument for appeal, and irrecoverably commingled funds.

Under the doctrine of invited error, a party may not materially contribute to an erroneous application of law at trial and then complain of it on appeal. *In re Dependency of K.R.*, 128 Wn.2d 129, 147, 904 P.2d 1132 (1995). Will Aldridge appeals the exact characterization he conceded at trial. In a written closing argument, Will Aldridge posited, "The Satterlee home is *inarguably community property*. However, equity favors an award of the Satterlee home to Will Aldridge, who contributed $260,000 +/- in separate funds to the acquisition of Satterlee." CP at 226 (emphasis added).

29

On appeal, Will Aldridge seeks an equitable lien, not a fractional interest in the Satterlee residence based on his separate property contribution. But at the trial court, he sought award of the entire home. Will's failure to seek a fractional interest at trial renders the mortgage rule inoperable. Similar to the lack of evidence of a purchase price of the Poolside Apartments, neither party provided the trial court evidence of the purchase price of the Anacortes residence. Thus, the trial court had no ability to estimate the percentage of Will's separate contribution toward the purchase price.

In arguing on appeal for an equitable lien of around $260,000, Will Aldridge estimates that he contributed $77,000 in separate property from the sale of his Yokeko cabin, first invested in the Aldridge's shared Dogwood residence, and $191,000 in separate property from the sale of his Anacortes commercial building. But there is no evidence in the record to support Will's estimate of $191,000. Further, Will admitted at trial that he deposited the proceeds from the commercial building into a joint account. Will made no attempt, either at trial or on appeal, to trace those funds and thus the funds are presumed community property.

*China Cabinet and Its Contents*

Will Aldridge contends that the trial court failed to characterize the china cabinet and its contents. We agree, but find no harmful error. While the proper characterization of property is not necessarily controlling, the trial court must bear in mind the community or separate character of the property being divided in making its decision. *In re Marriage*

30

*of Martin*, 22 Wn. App. 295, 297, 588 P.2d 1235 (1979). Although failure to properly characterize property may be reversible error, mischaracterization of property is not grounds for setting aside a trial court's property distribution if it is fair and equitable. *In re Marriage of Gillespie*, 89 Wn. App. 390, 399, 948 P.2d 1338 (1997). The trial court's failure to characterize the china cabinet and its contents does not require reversal, because, as discussed below, the distribution is fair and equitable.

## DIVISION OF PROPERTY

Will Aldridge contends the trial court abused its discretion when it: awarded Debra 11 percent of Will's civil service retirement benefits; awarded Debra the china cabinet; and ordered the sale of the Satterlee property and awarded Debra 58 percent of the proceeds.

This court reviews the division of property for an abuse of discretion. *In re Marriage of Muhammad*, 153 Wn.2d 795, 803, 108 P.3d 779 (2005). The trial court has "broad discretion," which will only be reversed if exercised on untenable grounds or for untenable reasons. *In re Marriage of Rockwell*, 141 Wn. App. 235, 242-43, 170 P.3d 572 (2007). This court recognizes that the trial court is "in the best position to assess the assets and liabilities of the parties" and to determine what constitutes an equitable outcome. *Brewer*, 137 Wn.2d at 769. If, however, "the decree results in a patent disparity in the parties' economic circumstances, a manifest abuse of discretion has occurred." *Rockwell*, 141 Wn. App. at 243.

31

The trial court's objective when dividing property is to divide and distribute the parties' property "as shall appear just and equitable." RCW 26.09.080. This statute requires the trial court to consider "all relevant factors including, but not limited to:" (1) the nature and extent of the community property; (2) the nature and extent of the separate property; (3) the duration of the marriage; and (4) the economic circumstances of each spouse at the time the division of the property is to become effective. RCW 26.09.080.

Just and equitable distribution does not mean that the court must make an equal distribution. *In re Marriage of DewBerry*, 115 Wn. App. 351, 366, 62 P.3d 525 (2003). Division of the property is not controlled by its character as community or separate; rather the object is to make a division which is fair, just and equitable. *Cummings v. Anderson*, 94 Wn.2d 135, 140 n.2, 614 P.2d 1283 (1980). Under appropriate circumstances, a trial court making a just and equitable distribution need not award separate property to its owner. *In re Marriage of White*, 105 Wn. App. 545, 549, 20 P.3d 481 (2001).

*Will's Civil Service Retirement*

Will Aldridge contends the trial court erred when it awarded Debra a portion of his civil service pension payments. Will argues that, in cases where one spouse is a federal employee and is not entitled to receive Social Security benefits but instead receives a federal pension, it is fair and equitable to award the federal employee spouse all of his pension since the other spouse will receive Social Security benefits. Will also argues that

32

the 11 percent award to Debra requires him to maintain a survivorship policy for Debra on his pension, unnecessarily reducing his pension by 15 percent.

At trial, Will Aldridge testified that he did not contribute to Social Security while working as a federal employee. Otherwise, he failed to preserve his in-lieu-of Social Security argument for appeal. He argues for the first time on appeal that a trial court must consider the amount of Social Security each spouse receives or does not receive. Will cites *In re Marriage of Rockwell*, 141 Wn. App. 235, 245, 170 P.3d 572 (2007) in support. *Rockwell* supports the argument that the trial court could have considered, when dividing the couple's assets, Will Aldridge's diminished participation in Social Security. But Will asserts that Rockwell required the trial court to consider the foregone amount of Social Security hiding within his pension. While the *Rockwell* court concluded "that the trial court properly considered and compensated for the Social Security benefits that [one spouse] would have received, but for her federal pension," that conclusion only acknowledged a lack of error. *Rockwell*, 141 Wn. App. at 245. A court may consider that amount to arrive at an equitable and fair distribution, but nothing requires it. Will did not attempt to quantify the amount of foregone Social Security or argue for its consideration below. Therefore, he waived the argument.

Will also testified that maintaining a survivor benefit reduces his civil service retirement benefit by 15 percent. In a pretrial motion, Will asked the court's permission to remove Debra as the beneficiary for that survivor benefit, writing, "My monthly

33

pension is reduced by approximately 15% as Debra is listed as the named pension survivor beneficiary." CP at 118. But Will does not explain how or why the court's award of 11 percent to Debra requires him to also maintain the survivor benefit. The notes for the January 23, 2013 hearing indicate that "Ms. Schmidt moved for entry of the Domestic Relation Order re Civil Service, granted, Order approved." CP at 370. This order is not in the appellate record. It might require Will to maintain the survivor benefit; it may not.

A party seeking review has the burden of perfecting the record so that the court has before it all evidence relevant to the issue on appeal. *State ex rel. Dean v. Dean*, 56 Wn. App. 377, 382, 783 P.2d 1099 (1989). Will fails to satisfy that burden. The trial court's decision must stand if this burden is not met. *Fahndrich v. Williams*, 147 Wn. App. 302, 307, 194 P.3d 1005 (2008).

*The China Cabinet*

Will Aldridge contends the trial court abused its discretion when it awarded the china cabinet to Debra. Will argues on appeal that the cabinet is a family heirloom, which he inherited or was gifted and thus should be his separate property.

Will inconsistently testified concerning the nature of the china cabinet. At trial, he declared that the cabinet "belonged to my first wife's grandmother. It has sentimental value for our family." RP at 610. When moving for reconsideration, Will described the cabinet as "an Aldridge family heirloom passed down through a number of generations."

CP at 323. Debra testified that the cabinet's contents belonged to her. It seems that Will sought the cabinet, where Debra sought its contents. Neither sought to disentangle one from the other.

The trial court did not explain its award of the china cabinet and its contents to Debra. We can explain the decision of awarding the cabinet to Debra as being based upon Debra's assigning it a higher value or because Debra's explanation being more credible than Will's shifting statements. In either case, the trial court exercised its discretion in a reasonable manner.

*The Satterlee Residence*

Will Aldridge contends the trial court erred when it ordered the Satterlee residence sold and awarded 58 percent of the proceeds to Debra. Will points to his efforts in designing and then building the Satterlee home, and his payment of taxes, insurance, and mortgage on the home for the three years of separation. He deems the award fundamentally unfair.

Ordinarily, a marital community is entitled to the fruits of all labor performed by either party to the relationship because each spouse is the servant of the community. *In re the Marriage of Lindemann*, 92 Wn. App. 64, 72, 960 P.2d 966 (1998). Will's designing and building was thus community labor and both he and his former wife are entitled to the benefit of his efforts. While Will paid taxes, insurance, and the mortgage on the Satterlee property for three years, he also lived there. The trial court's temporary

order compelling payment of the costs was reasonable and did not entitle Will to the residence upon the final decree.

The trial court could have ordered the parties to sell the Satterlee residence before finalization of the dissolution or immediately upon entry of the divorce decree. Instead the court provided Debra and Will a window of time, during which one could purchase the other's interest in the home. The trial court ordered the property be listed for sale only after both parties declined to purchase the other's interest. Even with the 58/42 award in Debra's favor, the trial court awarded her about 12 percent less of the overall property than it awarded to Will. By dividing the Satterlee home unequally, the trial court more equitably divided the property at large. The trial court did not abuse its discretion.

Will Aldridge also contends that the trial court abused its discretion when it ordered him to move out of the Satterlee home within a month. The trial court specifically found that Will "had been in the house for over 3 years and had made no effort to complete the repairs necessary for sale." CP at 370. Debra declared that the home continued to suffer water damage from leaks in the roof. The court's urgency served to prevent further damage to the home. Will argues that he was under no duty to prepare the house for sale. The decree of dissolution demands otherwise. The court ordered, "The home repairs necessary before listing shall be arranged, paid for and completed no later than March 15, 2013 to allow the home to be listed by April 1, 2013."

36

CP at 304. The court found Debra's declaration that Will had obstructed efforts to complete the needed repairs credible. We discern no reason to overturn that determination.

*The Overall Distribution*

Will Aldridge contends that the trial court's overall distribution of property was fundamentally unfair and an abuse of discretion. Will claims that he brought 95.8 percent of the real estate assets into the marriage and Debra brought 4.2 percent of the real property assets. In turn, according to Will, he brought $1,651,772 into the marriage: $76,907.63 in net proceeds from the Yokeko cabin; $32,068.48 in net proceeds from the 8th Street property; $535,796 in net proceeds from the Anacortes commercial building; and $1,007,000 as the value of the Deaconess Building. Will approximates that Debra, in contrast, brought to the marriage only $91,857.42, the net proceeds from the Peters residence, into the marriage. Will further argues that he possesses a unique talent to successfully undertake unattractive development projects and render them profitable. Will's argument ignores facts and is self-defeating.

Will Aldridge disregards the trial court's unchallenged conclusion that Will and Debra "established a committed equity relationship beginning in March 1999," two years before they remarried. CP at 291. Will overlooks the properties' increase in value during the equity partnership and marriage. Will snubs the extent to which Debra's and Will's community labor contributed to such increases. *See, e.g., Lindemann*, 92 Wn. App. at 70.

37

When the separate property in question is real estate or an unincorporated business with which personal services ostensibly belonging to the community have been combined, the rule is that all the income or increase will be considered as community property in the absence of a contemporaneous segregation of the income between the community and the separate estates. *Hamlin v. Merlino*, 44 Wn.2d 851, 858, 272 P.2d 125 (1954). Will provided no testimony that he contemporaneously segregated anything. The trial court found that, with regard to the Deaconess Building, the parties' largest asset, its "records are less than models of clarity, consisting mostly of pages of handwritten columns of dollar amounts." CP at 290. Will "acknowledged that certain payments ostensibly depicted in his 'accounting' have not actually been made." CP at 290.

Will Aldridge incongruently relies on sparse, and sometimes nonexistent, evidence to manufacture a sense of unfairness. He fails to show that the trial court abused its discretion.

Will Aldridge's argument that his unique skills allowed him to successfully undertake unattractive development projects during the marriage benefits Debra, not him. A principal factor for the trial court to consider when dividing marital assets is the economic circumstances of each spouse at the time the division of the property is to become effective. RCW 26.09.080(4). The trial court's paramount concern when distributing property in a dissolution action is the economic condition in which the decree leaves the parties. *Gillespie*, 89 Wn. App. at 399. The court may consider the parties'

38

prospects for future earnings, their education and employment histories, their necessities

and financial abilities, their foreseeable future acquisitions and obligations. *Friedlander*

*v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972); *Gillespie*, 89 Wn. App. at 399.

Thus, Washington law parrots the slogan made famous by Karl Marx: from each

according to his ability, to each according to his needs. Will Aldridge's Midas touch

means he will be financially successful in the future and less in need of marital assets

now.

### *During Separation*

Will Aldridge contends the trial court erred when it ordered Will, for the duration

of his and Debra's separation, to satisfy all community debts for the Satterlee property

and to return $14,500 of community funds. Will fails to support this contention with

argument or citations to legal authority. His two paragraphs of briefing only parrots his

related assignments of error. Those assignments are thus abandoned. RAP 10.3(a)(6);

*see, e.g.*, *Kittitas County v. Kittitas County Conservation Coal.*, 176 Wn. App. 38, 54,

308 P.3d 745 (2013).

### ATTORNEY FEES

Will Aldridge contends the trial court erred when it awarded Debra $5,000 in

attorney fees incurred at trial and, secondly, when it awarded Debra an additional $5,000

in attorney fees, not yet incurred, to defend this appeal. We review this decision for

abuse of discretion. We will reverse an attorney fees award if the decision is untenable or

manifestly unreasonable. *In re Marriage of Spreen*, 107 Wn. App. 341, 351, 28 P.3d 769 (2001).

The controlling statute is RCW 26.09.140, which provides in part:

> The court from time to time after considering the financial resources of both parties may order a party to pay a reasonable amount for the cost to the other party of maintaining or defending any proceeding under this chapter and for reasonable attorneys' fees or other professional fees in connection therewith, including sums for legal services rendered and costs incurred prior to the commencement of the proceeding or enforcement or modification proceedings after entry of judgment.

Using its discretion, the court balances the requesting party's need for a fee award against the other party's ability to pay. *In re Marriage of Ayyad*, 110 Wn. App. 462, 473, 38 P.3d 1033 (2002). The trial court must indicate on the record the method it used to calculate the award. *In re Marriage of Knight*, 75 Wn. App. 721, 729, 880 P.2d 71 (1994). In calculating a reasonable amount of fees, the court should consider the following three factors (1) the factual and legal questions involved, (2) the amount of time necessary for preparation and presentation of the case, and (3) the value and character of the property involved. *Ayyad*, 110 Wn. App. at 473. The party challenging the award on appeal bears the burden of proving that the trial court exercised this discretion in a way that was clearly untenable or manifestly unreasonable. *Knight*, 75 Wn. App. at 729.

*Award for Attorney Fees Incurred at Trial*

Will Aldridge asks this court to vacate the trial court's award of $5,000 for fees incurred for trial on the ground that the trial court did not state its method of calculating the award on the record. But the trial court did state its method of calculation on the record when it wrote: "*In light of the overall financial circumstances of the parties* and the Court's award of the community and separate property to each party, the Court will reduce the $10,000 in fees awarded to Ms. Aldridge to the sum of $5,000 in fees." CP at 373 (emphasis added). The court's method was to consider each party's financial circumstances. This is the exact method described in RCW 26.09.140. The court did not abuse its discretion.

*Award for Attorney Fees to Defend Appeal*

Will Aldridge argues that the trial court committed error when it awarded Debra Aldridge fees to defray costs on appeal. He contends the trial court lacked authority to award reasonable attorney fees and costs on appeal before the fees are incurred.

We do not consider problematic an award of fees before the incurring of fees. We consider problematic the question of whether the trial court may, while an appeal is pending, award a party to a marriage dissolution action attorney fees and costs against the other spouse to defray the expenses of the appeal. The converse question is whether the Court of Appeals is the exclusive court possessing authority to award attorney fees and costs for the expense of an appeal. Based upon RAP 18.1, we hold that only the appellate

court may order fees be paid for an appeal, although the reviewing court may remand the

determination of the amount of the award to the trial court.

A relevant statute is RCW 26.09.140, which reads in pertinent part:

> *The court from time to time* after considering the financial resources
> of both parties may order a party to pay a reasonable amount for the cost to
> the other party of maintaining *or defending any proceeding under this
> chapter* and for reasonable attorneys' fees or other professional fees in
> connection therewith, including sums for legal services rendered and costs
> incurred prior to the commencement of the proceeding or enforcement or
> modification proceedings after entry of judgment.
>
> *Upon any appeal, the appellate court may*, in its discretion, order a
> party to pay for the cost to the other party of maintaining the appeal and
> attorneys' fees in addition to statutory costs.

(Emphasis added.)

The second paragraph of RCW 26.09.140 grants authority to the appellate court to

award fees on a discretionary basis. The paragraph, however, does not state that the

Court of Appeals is the only court that may award fees for the appeal, nor does the statute

expressly exclude another court from granting fees on appeal. The first paragraph allows

"the court" to award fees "from time to time" for "defending any proceeding under this

chapter." We understand "the court," to which the legislature refers in the first

paragraph, to be the superior court. An appeal from a decree of dissolution would

reasonably be a "proceeding" under chapter 26.09 RCW. Thus, the first paragraph of

RCW 26.09.140 may impliedly grant the trial court authority to award fees for the appeal.

A rule allowing the trial court to award fees pending an appeal would increase the

42

chance that a financially strained party may retain an attorney on appeal. An attorney may be reluctant to represent a party if he or she must wait until a ruling on the merits by the Court of Appeals before knowing if he or she will be paid for services performed. Since the Court of Appeals does not grant awards until the completion of the appeal, the trial court is in the better position to award fees pending the appeal. Decisions before the Rules on Appeal and cases before the current marital dissolution legislative scheme noted the need for an indigent spouse to be awarded fees for the appeal before the fees were incurred. *Bennett v. Bennett*, 63 Wn.2d 404, 418, 387 P.2d 517 (1963); *State ex rel. Brown v. Superior Court. for King County*, 190 Wash. 572, 574-75, 69 P.2d 811 (1937). We consider current law to be otherwise, however.

The controlling authority is RAP 18.1, which reads in part:

> (a) Generally. If applicable law grants to a party the right to recover reasonable attorney fees or expenses on review before either the Court of Appeals or Supreme Court, the party must request the fees or expenses as provided in this rule, unless a statute specifies that the request is to be directed to the trial court.
>
> . . . .
>
> (f) Commissioner or Clerk Award Fees and Expenses. A commissioner or clerk will determine the amount of the award, and will notify the parties. The determination will be made without a hearing, unless one is requested by the commissioner or clerk.
>
> . . . .
>
> (i) Fees and Expenses Determined After Remand. The appellate court may direct that the amount of fees and expenses be determined by the trial court after remand.

(Boldface omitted.)

43

RAP 18.1(a) supplies our answer. The rule demands any request for fees to comply with RAP 18.1, which necessarily implies the request must be addressed only to the Court of Appeals. An exception is when a statute "specifies" that the litigant forward the request to the trial court. RCW 26.09.140 does not "specify" or expressly demand that the requesting spouse apply for fees before the trial court for an award on appeal.

We note that Debra Aldridge did not follow the requirements of RAP 18.1(c), (d), and (e), by inserting an argument for fees on appeal in her brief, filing an affidavit of financial need, or filing an affidavit of fees. Instead, she argued in her brief for affirmation of the trial court's award for fees on appeal and referred to affidavits filed with the superior court. Debra had reason to ignore RAP 18.1, since she had been awarded fees already. Because we now reverse the award, we waive the requirement of RAP 18.1(c) and allow Debra to seek fees without an argument in her brief. We further waive the requirements of RAP 18.1(d) and (e), by allowing Debra and her counsel to file an affidavit of financial need and of fees within 21 days of this decision. RAP 1.2(c) grants us the authority, with few exceptions, to waive the provisions of any of the appellate rules in order to serve the ends of justice.

We retain jurisdiction of the appeal to determine if fees should be awarded to Debra for appellate services. We also reserve the decision of whether a court commissioner or the trial court will determine the amount of any fees to be awarded. If

Debra seeks an award of fees on appeal, she will not be limited to the $5,000 sum previously awarded by the trial court.

## OTHER ASSIGNMENTS OF ERROR

Will Aldridge assigns error to many of the trial court's findings of fact and conclusions of law, but he mixes the two together and fails to identify any finding by number. We refuse to address these additional assignments of error. RAP 10.3(g) prescribes that the appellant's brief list a separate assignment of error for each finding of fact a party contends was improperly made with the identification of the finding by number.

## CONCLUSION

We affirm all trial court rulings, except the award of reasonable attorney fees and costs for the appeal. We vacate that award, but grant Debra Aldridge the opportunity to apply to this court for an award on appeal.

No. 31597-5-III
*In re Marriage of Aldridge*

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Fearing, J.

WE CONCUR:

_____
Brown, A.C.J.

_____
Korsmo, J.

46